WILLIAM H. CORBIN, TAX COMMISSIONER, *vs.* SIMEON E. BALDWIN ET ALS., EXECUTORS.

SIMEON E. BALDWIN ET AL., EXECUTORS, *vs.* WILLIAM H. CORBIN, TAX COMMISSIONER.

Third Judicial District, New Haven, June Term, 1917.
PRENTICE, C. J., RORABACK, WHEELER, SHUMWAY and TUTTLE, Js.

The words of a statute are presumed to have been used in their ordinary signification; but the context, the history of legislation upon that subject, the effect of the statute under different interpretations, and all the circumstances and conditions under which the Act was passed, are to be considered in determining its construction.

The long-established public policy of the State not to impair the usefulness of gifts to educational and charitable uses by subjecting them to taxation, may doubtless be set aside by legislation, but the intent to do so will not be deduced from doubtful or ambiguous expressions.

Chapter 332, § 3, of the Public Acts of 1915, provides that all property owned by a resident of this State at his decease, which passes by will to Connecticut corporations or institutions which receive "state aid," shall be exempt from so-called inheritance or succession taxes. *Held* that "state aid" as thus used, was not to be restricted to pecuniary assistance extended by the State by way of direct appropriations, as contended by the Tax Commissioner, but included help and assistance afforded by the State of whatever kind and by whatever means or method it might be furnished; and therefore that local corporations or institutions, whose property, because of its devotion to the use and service of the public, was exempted by the legislature from ordinary taxation, were the

Corbin v. Baldwin.

recipients of "state aid," and, as such, were not subject to the payment of death duties under the terms of the Act. (*Two judges dissenting.*)

Strictly speaking, the imposts required by the Act of 1915 are not taxes upon persons or property, but rather death duties levied by the State in the course of the settlement of estates of decedents as an incident to the devolution of title by force of its laws.

In computing the amount of an estate for the purpose of determining the succession tax, the following items should be deducted: sums paid by the executors as inheritance taxes in another State, taxes paid to the municipality of the decedent's domicil, and the amount of income tax paid to the Federal government.

In the present case the Court of Probate figured the tax at eight per cent upon the net estate, about $715,000, passing to persons or corporations in class C.. *Held* that this was erroneous: that the tax upon $49,500 should have been figured at five per cent, on $200,000 at six per cent, and upon the balance at seven per cent, as required by § 6 of the Act of 1915.

Argued June 5th—decided August 2d, 1917.

APPEALS from an order and decree of the Court of Probate for the District of New Haven determining the amount of the inheritance and succession tax due the State from the estate of Justus S. Hotchkiss of New Haven, deceased, taken to and reserved by the Superior Court in New Haven County, *Warner, J.,* upon the demurrers filed by the Tax Commissioner to the answer to the reasons of appeal in the first case, and to the reasons of appeal in the second, for the advice of this court. *Judgment advised in favor of the executors.*

Justus S. Hotchkiss, late of New Haven, died possessed of an estate appraised in the inventory thereof at approximately $2,000,000. By his will he made bequests and devises to various persons and corporations. Among them were the First Ecclesiastical Society of New Haven, the General Hospital Society of Connecticut, the New Haven City Burial Association, the Home for the Friendless, the Lowell House, and Yale University, the latter being the residuary

Corbin *v.* Baldwin.

legatee and devisee. In the course of the administration of the estate, the Court of Probate passed an order and decree adjudging (1) that the gifts to the First Ecclesiastical Society, the General Hospital Society, the New Haven City Burial Association, and Yale University, were exempt from the payment of an inheritance tax; (2) that those in favor of the Home for the Friendless and the Lowell House were subject to such tax; and (3) that the amount of tax due the State was $58,082.80, the same being figured at eight per cent. From so much of this order and decree as established the above exemptions the Tax Commissioner appealed, his appeal being the first named of the above-entitled cases. From that portion which subjected the gifts in favor of the Home for the Friendless and the Lowell House to the tax, the executors appealed, their appeal being the second of the two cases. The appeal by the executors also embodied reasons of appeal alleging that the court erred in failing to make certain deductions from the total amount of the appraisal of the estate and the gains to be added thereto, and in computing the amount of tax payable at the uniform rate of eight per cent instead of a graduated rate of five, six and seven per cent.

*George E. Hinman*, Attorney-General, and *Charles W. Cramer*, for the Tax Commissioner.

*Henry Stoddard* and *J. Dwight Dana*, with whom was *John W. Bristol*, for the executors.

PRENTICE, C. J. By the will of Mr. Hotchkiss, six corporations were made the beneficiaries of gifts. One of these gifts, to wit, that to the General Hospital Society of Connecticut, confessedly is not subject to the payment of an inheritance tax. The Tax Commis-

sioner contends that the other five are. Their beneficiaries, on the other hand, assert that they are exempt from such payment. These conflicting claims form the principal subject of these appeals.

These five beneficiaries include Yale University, a corporation chartered for educational purposes; the Home for the Friendless, and the Lowell House, the first chartered to carry on a benevolent and charitable work, and the second organized under the general law for a similar purpose; the First Ecclesiastical Society of New Haven, an ecclesiastical and religious corporation; and the Proprietors of the New Haven Burial Ground, designated in the will as the New Haven City Burial Association, incorporated for the purpose of maintaining a burial ground, and having as its sole property land exclusively used for such purpose. All of them enjoy at the hands of the State exemptions from taxation.

The record makes it clear that, if the gifts to these beneficiaries are to pass to them free from an inheritance tax, it must be by force of that provision of the statute which exempts "all property passing to or in trust for the benefit of any corporation or institution located in this State which receives state aid." Public Acts of 1915, Chap. 332, § 3. It also makes it equally clear that the sole claim to exemption by virtue of this statutory provision, which any of the corporations involved can successfully assert, is one founded upon the tax exemptions with which they are and for years have been favored at the hands of the State. In making this statement we do not ignore certain facts recited in the answer of Yale University demurred to, and thus presented by it in aid of its position, but they are at best of minor importance, and do not impress us as adding materially, if at all, to the strength of its position. Its claim to exemption must, therefore, rest for

its support upon the proposition which it, in common with the other beneficiaries before the court, advances, that the gift to it is one which it is entitled to receive without diminution by reason of the imposition of a succession tax, for the reason that it is a corporation in receipt of State aid through the medium of exemptions from taxation conferred upon it at the hands of the State.

The claim thus made by the five corporations is not, it is to be borne in mind, that they are entitled to receive the gifts in their favor free from succession tax through the direct operation of statutes prescribing tax exemptions in their favor. Their claim, on the other hand, gives full recognition to the well-established law of this jurisdiction, that so-called inheritance or succession taxes are not taxes laid upon either persons or property, or, strictly speaking, taxes at all, but rather death duties, levied as exactions of the State in the course of the settlement of estates and as incidental to the devolution of title by force of its laws. *Hopkins' Appeal*, 77 Conn. 644, 649, 60 Atl. 657; *Warner* v. *Corbin*, 91 Conn. 532, 536, 100 Atl. 354. It concedes that if the gifts to them are to escape these death duties, it must be not for the reason that they are taxes in the ordinary sense, but for the reason that the so-called inheritance tax law specifically excludes them from its operation as having been made to corporations in receipt of State aid through the medium of tax exemptions.

The question at issue thus becomes narrowed to one of statutory construction. The law provides that property owned by a resident of this State at his decease, which shall pass by will or the general law of distributions to corporations or institutions in receipt of State aid, shall so pass inheritance tax free. Public Acts of 1915, Chap. 332, § 3. The Tax Commissioner contends

that the corporations and institutions receiving State aid, within the true meaning and intent of this provision, are limited to those receiving pecuniary assistance by direct State appropriation, and that those corporations and institutions otherwise aided and assisted by the State's action are not included. His counsel urge that this portion of the Act is to be interpreted as though it contained the qualifying words "by appropriations," or language of similar purport, so that it read "State aid by appropriations" or equivalent language. The beneficiaries of the gifts assert, on the other hand, that all those corporations and institutions aided or assisted financially in whatever way, and whether by direct appropriation of State funds, or by the provision of material agencies for the conduct of their work, or by the enhancement of their financial resources by excusing them from the payment of taxes, are to be regarded as recipients of State aid as that term is employed in the statute.

In *Beach* v. *Bradstreet*, 85 Conn. 344, 353, 82 Atl. 1030, we said that "the ordinary definition of aid is help, support, or assistance," and that "State aid is support or assistance furnished by the State." The qualifying word "State" is of no importance, save as indicating the source from which the aid comes. "Aid" is the word which possesses significance for our present inquiry, and that word, as its definition clearly discloses, is one whose ordinary meaning is broad and comprehensive, and inclusive of help and assistance of whatever kind and by whatever means or method provided. There are various means and methods which may be resorted to by individuals in furnishing aid and assistance. The same is equally true of the State. It may, of course, make direct appropriations or payments by which the treasury of the recipient is replenished. If, instead, it excuses a corporation or institution from the

payment of taxes, it gives aid, assistance, and support
to such corporation or institution just as much and
just as efficiently as it would by the appropriation of
an amount equal to the taxes the corporation or institu-
tion would be required to pay were there no exemption.
The result in either case, although accomplished by
different means, is precisely the same. The difference
is one of method, and not of kind or degree of aid fur-
nished. In the one case the money is paid over and
paid back; in the other, no money passes. In both the
result, as reflected in the treasury of each of the par-
ties, is the same. If the language of the statute is to
be accorded its ordinary and natural meaning, our
conclusion must, therefore, be that State aid embraces
aid given by means of exemptions from taxation as
well as by other means, as, for example, by appropria-
tions.

While this is true, and the presumption is that the
words of the statute were used in their ordinary sig-
nification, it does not necessarily follow that the term
"State aid" was not used therein in some less compre-
hensive sense, or in the qualified and restricted sense
for which the Tax Commissioner contends. His claim,
therefore, calls for our inquiry as to the legislative in-
tent, involving a consideration of the language used,
its context, pertinent antecedent legislative history,
related legislation, the subject-matter with which the
language deals, its operation as it may be interpreted,
the conditions and circumstances under which it was
enacted, and all other matters calculated to throw
light upon the subject of inquiry.

First and foremost we have the language of the
statute. The natural and ordinary meaning of the
term which is the subject of consideration does not,
as we have already had occasion to observe, harmonize
with the interpretation the Tax Commissioner would

have us put upon it, and its context throws no additional light upon the sense in which it was employed.

Counsel for the Commissioner, in aid of their contention, point to the use of the term in the indices of the Revision and session laws, and in the body of statutes. Our examination of the indices referred to, as well as others, discloses that under the heading of "State aid," references are repeatedly made to statutes providing for the payment of moneys in aid of various objects. Such references are so made with undoubted propriety, since such payments are unquestionably State aid. It also reveals that in nearly as many instances, statutes providing aid and assistance by other means than the payment of money to the objects to be benefited, are referred to under that head. References of the two kinds are indiscriminately intermingled. This is noticeably so in the Revision, where the majority are to statutes of the latter character. As for the statutes themselves, there are two instances. which have come under our observation in which the term "State aid," judging by the context, was used in the limited sense of aid by appropriations or direct payment. General Statutes, §§ 183, 1368. Our attention has not been called to others of that character. Scant proof, surely, is thus furnished of an accepted, customary, or common statutory use of the term in the narrow sense contended for. Far more suggestive of the meaning in which it was employed in the statute of 1915, is the fact that in the opinion in *West Hartford* v. *Connecticut Fair Asso.*, 88 Conn. 627, 630, 92 Atl. 432, handed down only a few months before its enactment, we characterized tax exemptions as State aid.

Looking outside of legislation to the conditions and circumstances under which the Act of 1915 was enacted, the subject-matter with which it deals, and its operation, there are several matters of large significance as

bearing upon both the rule of interpretation which should be employed and the interpretation which should be given to the language in controversy.

Foremost of these is the public service character of tax-exempted corporations and institutions, and the public service performed by them, which furnishes the sole reason for the existence of their exemption. While it may be true, and doubtless is, that tax exemptions have at times been granted with too great liberality and with scant regard for their fundamental reason, such is not the case in the vast majority of instances, and manifestly is not in the case of any of the parties before the court.

It is to be borne in mind that exemptions are made, and can be made lawfully, only in recognition of a public service performed by the beneficiary of the exemption. They are not bestowed, as is too often unthinkingly supposed, as a matter of grace or favor. If lawfully granted, as most are, and as we for present purposes are bound to assume that all are, they are granted in aid of the accomplishment of a public benefit and for the advancement of the public interest. It is in recognition of their position as an agency in the doing of things which the public, in the performance of its governmental duties, would otherwise be called upon to do at its own expense, or which ought to be done in the public interest and without private intervention would remain undone. *Yale University* v. *New Haven*, 71 Conn. 316, 332, 42 Atl. 87. In the fullest sense of the word, the exemptions are given for the assistance and help of the private endeavor in its effort to advance the public interest or to perform some share of the public governmental duty.

This is true not only theoretically but practically. The extent of the public service, and of that service within the range of governmental duty, which is per-

formed by private beneficiaries operating through the medium of tax-exempted institutions and corporations is enormous, and the importance and value of it in its purely public aspects incalculable. The amount of taxes which are lost to the State and its political subdivisions by reason of exemptions are of trifling consequence as compared with the sums coming from private sources which are spent for the public weal. They are trifling as compared with those spent for purposes governmental in their character, and which, but for the private expenditure, would become a charge upon the public treasury if the governmental duty of an enlightened modern State is to be performed.

The history and service of Yale University, one of the present beneficiaries having the largest interest under the will before us, furnishes a forcible illustration of the truth of the foregoing observations. The numerous charitable institutions of the State, among which are two of the institutions before the court, furnish other incidents as striking. But we may well take as a single example the typical one afforded by Yale.

It had its origin in a profound conviction on the part of the leaders of the infant Colony, that the public welfare demanded the establishment within its borders of a school of higher education, where young men might be prepared and trained to render the best public service to the community and State. The task of providing such a school in those days was no small one, but the urgency of the need, if the Colony was to prosper and maintain the necessary standard of intelligent and capable leadership, was so keenly felt and appreciated that, in spite of the difficulties, the longed-for institution came into its first modest existence. Its charter expressed the feeling of the time as to the place it was intended it should occupy as a pub-

lic agency, when it characterized the purpose of the
projected school as one wherein "youth may be in-
structed in the arts and sciences, who, through the
blessing of Almighty God, may be fitted for public
employment, both in church and civil State." The
history of the institution thus founded need not be
followed through the succeeding years, further than
to observe that from the first it has enjoyed exemption
from taxation, and not infrequently was made the
recipient from the State of direct financial help.

Can any one, who reads the story of Yale's beginning
and development, doubt that our fathers in founding
it did so to provide what they thought to be a much
needed agency of public service, that the Colony, and
subsequently the State, in making direct gifts and tax
exemptions in its favor, were actuated by the same high
purpose, and that the tax exemptions early made and
through the years since maintained, were made for
the conscious purpose of giving substantial aid to the
undertaking whose work it was felt was and would
continue to be fraught with great public benefit to
community and State? The same appreciation of the
public service rendered by institutions of higher educa-
tion, has led many of our sister States to make large
expenditures from the public treasury in the establish-
ment and maintenance of such institutions. The
eastern States have, for the most part, been spared the
necessity of making these expenditures by reason of the
willingness of private benevolence to assume the task
elsewhere shouldered by the State. In this way Con-
necticut has been favored. Its institutions and col-
leges are able to rely for their support upon private
contributions and endowments, with only such State
assistance as results from exemptions from taxation.
The assistance gained through these exemptions has
been of no small help in the conduct of their work and

of no small proportions. But that from private sources has been far greater. The latter fact should not be allowed to obscure the public character of the work carried on by them. Neither should the former be forgotten when credit for the support of that work is being given to those who have furnished substantial aid.

The public policy of this State, and of the colonial government which preceded it, has, from its early days, been governed by a recognition of the public character deserving of public assistance and support of not only Yale's work, but also of that of other educational and charitable institutions and related institutions generally. In 1684 it was provided, "for the incouragement of learning and promoating of publique concernments," that all houses or lands given or held for "the mayntenance of the ministry, or schooles, or poore," should remain to the uses for which they were given, and be exempted out of the list of estates, and be rate free. 3 Col. Rec. 158. In 1702 this Act was succeeded by a broader one, furnishing the basis of our present statute of charitable uses (General Statutes, § 4026), which embraced within its provisions land, tenements, hereditaments, and other estates, given by Colony, town, village, or persons, for the maintenance of the ministry of the gospel, schools of learning, relief of poor people, or any other charitable use. Acts and Laws of the Colony, 1702, p. 64. This Act contained the general exemption provision, and continued in force until 1821. At that time the exemption clause was dropped from it, and since then the general policy of exemption indicated has been followed by general and special legislation to the extent, at least, of substantial, if not total, exemption. Rev. 1821, Title 56, Chap. 1, § 3.

This legislative history has no present importance save as it shows the long-time consistent policy of the Colony and State in not violating the ordained sanctity

of property dedicated by gift of its owner to public charitable uses, by depleting its amount or effectiveness for the purpose of its dedication, through the levy of a tax or the imposition of other State burden upon it. If now it is proposed to reach out and take toll of such gifts in the process of the devolution of title, it marks a new and radical departure in policy in striking contrast with that which heretofore has characterized our governmental history. Such a departure is one which a court will be slow to find to be within the legislative intent, unless indicated by clear and unambiguous language.

Every dollar which Yale University has received or may receive, by gift or otherwise, is irrevocably dedicated to a public charitable use. General Statutes, § 4026; *Connecticut College* v. *Calvert*, 87 Conn. 421, 428, 435, 88 Atl. 633. When the title to property vests in the University, that property "passes out of the domain of private property" and becomes devoted forever to a public charitable purpose. *Yale University* v. *New Haven*, 71 Conn. 316, 333, 42 Atl. 87. The same is true of the funds held or received by the other beneficiaries in court. A generous public spirit prompted Mr. Hotchkiss to withdraw a large portion of his large estate from the domain of private property, capable of use for private enjoyment or profit, and to devote it to the public charitable uses represented by it and them. It is doubtless within the power of the State, by means of succession taxes so-called, to appropriate to itself some portion of the estate so undertaken to be devoted, and thereby divert it to some other public use not within the mind or purpose of the testator, but its intention to do that thing will not be deduced from language not clearly expressing or indicating such intention. *Evergreen Cemetery Asso.* v. *New Haven*, 43 Conn. 234, 242.

The claim of counsel for the Tax Commissioner, that since that portion of the Act under consideration embodies an exemption from the operation of the general rule prescribed by the Act it should receive a strict construction, is not well made. The rule of construction thus appealed to is one which has its limitations, as is clearly pointed out in *Yale University* v. *New Haven*, 71 Conn. 316, 329, 42 Atl. 87, and the present situation is one which comes well within them.

Turning now to the history of inheritance-tax legislation in this State for light which it may throw on the subject of inquiry, we find that the first legislative attempt in that direction was made in 1889, when a statute was enacted laying such taxes, but specifically exempting property passing to or for some charitable purpose, defined as including "gifts to any educational, benevolent, ecclesiastical, or missionary corporation, association, or object." Public Acts of 1889, Chap. 180, §§ 1, 17. In the matter of exemptions, the law remained unchanged until 1897, when, in reframing the Act, nothing was said upon that subject. Public Acts of 1897, Chap. 201. This silence, incomprehensible as it may appear in view of the traditional policy of the State continued until 1911, save for the passage in 1909 (Public Acts of 1909, Chap. 218, § 1) of an Act exempting "gifts of paintings, pictures, books, engravings, bronzes, curios, bric-a-brac, arms, and armor, and collections of articles of beauty or interest, made by will to any corporation or institution located in this State for free exhibition and preservation for public benefit." At the session in 1911 an Act, consisting of seven lines only, was passed, which provided for the exemption of all gifts thereafter made by will to or for the benefit of any corporation or institution, located in the State, "which receives State aid by appropriations provided for by the general statutes," and further pro-

viding that the exemption should extend to all like gifts theretofore made to or for the benefit of such corporations or institutions, on which a succession tax had not been paid. Public Acts of 1911, Chap. 148. In 1913 the succession tax law was extensively revised, and in that revision all property passing in trust for any charitable purpose to be carried out within the limits of this State, or to or for the use of municipal corporations of the State for public purposes, and gifts of the kind covered by the amendment of 1909, were exempted from the tax imposed by the Act. Public Acts of 1913, Chap. 231, § 2. Then followed the Act of 1915, again remodeling and elaborating the law, and containing the provision under consideration in the place of that embodied in the Act of 1913.

This history, with its frequently recurring changes, is barren of indication as to the intended meaning of the phrase under consideration, except such as may be derived from the legislation of 1911 and subsequent years.

From the latter legislation it would appear that the General Assembly had become awakened, in some degree at least, to the lack of wisdom shown in the Act of 1897, in that the State was made to take toll of all private benefactions coming within the jurisdiction of Courts of Probate, whether or not they were made in favor of organized agencies engaged in the performance of a work in the interest of the public welfare. How full that awakening was, as shown by the amendment of 1911, is not altogether apparent. It is curiously phrased, in that it in terms limits the State aid by appropriations to appropriations provided by general statutes. Whether the inclusion of that qualification was inadvertent or intentional, we have no means of knowing. If the latter was the case, the Act was one of very narrow application, since appropriations by

general statute are very exceptional. If the former, and the intention was to confine the exempted corporations and institutions to those receiving State aid through appropriations, it was intended to be what counsel for the Tax Commissioner say that the Act of 1915 provides in the absence of any qualifying words at all.

Whatever the legislative intent was which the amendment of 1911 attempted to express, that embodied in the Act of 1913 is unmistakable. Apparently the General Assembly had come to realize that a sound public policy dictated that the State should not appropriate to itself, for use for its public purposes generally, property, or any portion of property, which had been dedicated by its late owner to public charitable uses, and that consistency of State action demanded that such exaction should not be made where, for a similar reason, taxation was foregone. At any rate, and for some reason it regarded as sufficient, it provided broadly that all property passing in trust for a charitable purpose should be exempt from the payment of inheritance taxes, thus going back to and adopting the policy embodied in the original Act of 1889.

Our legislation having thus, after a wide departure and sundry experiments, come back to where it began, and to a policy consistent with that which has marked our traditional attitude toward corporations and institutions engaged in service for the public weal, in harmony with our treatment of the property of such corporations and institutions in other respects, and supported, as we have seen, by dictates of sound reason, did the General Assembly of 1915 intend to depart again and take a step back from the position assumed in 1913? If it did, the way was open for it to accomplish that result by the use of plain and simple language—some such language, for instance, as that which the

amendment of 1911 suggests. It would have been the simplest thing in the world to have expressed it in unmistakable language, and it is little short of inconceivable that if it was the legislative purpose to limit the exemption to gifts to corporations and institutions in receipt of State aid through the medium of appropriations, that it did not say so unequivocally, and not leave the desired limitation to be supplied by interpretation. The Tax Commissioner's claim asks us to supply such unexpressed qualification. It asks us to say that when the General Assembly used the term "State aid"—a term of comprehensive meaning, as we have seen—it meant such aid furnished by a particular means and in a particular method. We are unable to see any valid reason for so limiting the language it used, and thus supplying by implication the words without which the desired qualification is not suggested.

Certainly no inference that the term "State aid," in the 1915 Act, was intended to be understood with the qualification that the aid should be by State appropriation or direct payment from the treasury, can reasonably be drawn from the fact that the same words, "State aid," appear in the 1911 Act accompanied with the qualification that the aid should be by appropriations. Rather is the omission of the qualifying words once used, confining the aid to that by appropriations, suggestive of an intentional omission of them.

Neither does the fact that different language was used in the Act of 1915 from that of the Act of 1913, furnish a substantial basis for an inference that a radical departure from the rule prescribed in the former law was intended, much less the particular departure claimed by the Commissioner. It might well be that the change of language was prompted by a desire to supply a definite and precise test in place of one less precise, and to confine the benefits of the exemption to

corporations and institutions whose public service character had received legislative certification by grants of aid either directly or by exemption from taxation. But whether so or not, and whatsoever other inferences may fairly be drawn from antecedent legislation, the fact remains that the General Assembly of 1915 did not use language indicating, with any reasonable degree of certainty, its purpose to impose succession taxes upon property passing, upon the death of its owners, to corporations and institutions which, by reason of their character as corporations and institutions receiving, holding, and administering property solely in the interest of the public welfare, were in the enjoyment of the aid of the State by way of exemptions from taxation.

The Court of Probate, in making its computations for the purpose of determining the amount of tax to be paid by the executors, and in framing its order and decree, made, as the Tax Commissioner concedes, two errors. One of these was in omitting from its deductions from the total amount of the appraisal of the inventory and the gains to be added thereto to obtain the net estate passing to beneficiaries, the following items, to wit: (1) $9,017.97 paid by the executors to the State of New Jersey as inheritance taxes, (2) $1,399.90 paid by them to the tax collector of New Haven as taxes, and (3) $708.99 paid by them to the United States Internal Revenue Collector as an income tax. By reason of these omissions, which total $11,126.86, the total amount passing to beneficiaries, as ascertained, was too large to that extent. This error is one which requires a modification of the decree in several places, and renders incorrect the court's final determination and adjudication as to the amount of tax due. The other error arose from the computation of the tax to be paid at eight per cent upon the net estate not exempt, whereas it

Corbin *v.* Baldwin.

should have been figured at five per cent on $49,500, six per cent on $200,000, and seven per cent on the balance. Corrections, as to which the parties are agreed, should be made in the decree wherever these errors or their results appear.

The Superior Court is advised to render its judgment (1) affirming so much of the order and decree of the Court of Probate as adjudged that the gifts to Yale University, the First Ecclesiastical Society of New Haven, and the New Haven City Burial Association are exempt from the payment of an inheritance tax; (2) modifying said order and decree so that it shall declare that the legacies to the Home for the Friendless and the Lowell House are likewise exempt; (3) amending it by incorporating therein the corrections outlined in the paragraph of the opinion immediately preceding this rescript; and (4) making such other incidental changes in it as may be necessary in order that it may correctly state the results flowing from the modification, amendments, and corrections thus made.

No costs in this court will be taxed in favor of any of the parties.

Is this opinion SHUMWAY and TUTTLE, Js., concurred.

WHEELER, J. (dissenting). Five beneficiaries under Mr. Hotchkiss' will claim exemption from the payment of the succession tax, by virtue of the statute which exempts "all property passing to or in trust for the benefit of any corporation or institution located in this state which receives State aid." The question for decision is whether each of these beneficiaries is a "corporation or institution . . . which receives State aid." Public Acts of 1915, Chap. 332, § 3.

Each of these beneficiaries has been receiving from the State an exemption from ordinary taxation. The only

Corbin *v.* Baldwin.

basis upon which their claim is supported in the majority opinion, is that the exemption from ordinary taxation accorded them is the receipt by them of State aid. The issue is thus a narrow one: Does the term "State aid," as used in the succession tax law of 1915, include aid rendered by way of exemption of property from taxation? The court relies for its conclusion upon (1) the ordinary meaning of State aid; (2) our judicial definition of the term; (3) the absence of anything in our statutes indicating that the use of this term is other than its ordinary one; (4) the history of our succession tax; and (5) the existence of a public policy in favor of the exemption of legacies to these institutions and corporations from the succession tax.

We will take up these points in order. The court quotes our definition of State aid from *Beach* v. *Bradstreet*, 85 Conn. 344, 353, 82 Atl. 1050—"State aid is support or assistance furnished by the State," and says that the qualifying word "State" is of no significance, save as indicating the source of the aid. Hence, it is argued, any form of support or assistance furnished by the State, whether by money grant, or by excusing the corporation or institution from the payment of taxes, falls within the ordinary and natural use of language under the term "State aid."

As it seems to us, the word "State" in the term "State aid," and in the definition of *Beach* v. *Bradstreet*, is all-important, for there can be no State aid unless the State furnishes the support or assistance. The opinion quotes a part of our definition in *Beach* v. *Bradstreet*. We shall get a clearer view of the definition if we have it before us entire. "The ordinary definition of aid is help, support, or assistance . . . furnished by the State to its institutions, organizations, or individuals for a public purpose. It is a term of our statutes, applied to pecuniary assistance furnished by the State

to towns, schools, etc., and for internal improvements—all recognized public purposes." Our definition called for (1) support or assistance, (2) furnished by the State, (3) for a public purpose. To furnish, is to provide for, to give. It presupposes the giving of pecuniary assistance or support directly. One would not, in the natural use of language, speak of furnishing assistance to A, when what was done was not to give A something but to relieve A from paying a public obligation due the State. Affirmative and not merely negative action is. required. The definition in *Beach* v. *Bradstreet* was intended to include aid furnished by the State, either in a pecuniary way, or by way of support furnished through appropriations made to that end. This becomes doubly clear when we read this definition in connection with the statute there under consideration. Since the State cannot furnish either pecuniary assistance, or support, unless there be an existing appropriation under law for a particular purpose, the furnishing of support is in reality the furnishing of pecuniary assistance. The definition of *Beach* v. *Bradstreet* does not include as "State aid" the indirect assistance afforded one by relief from the payment of taxes. When that opinion was rendered no such claim was made before the court and the court had no thought of it.

The majority opinion meets the contention of the Tax Commissioner—that the use of the term "State aid" in our statutes is in the sense of pecuniary assistance, or support,—by the statement that it finds scant proof of such an accepted statutory use of this term from its use in the indices of our statutes and in the two sections of the statutes to which it alludes in the opinion. If these instances were all that the statutes revealed, certainly their conclusive character could not be maintained. The contention of the Tax Commissioner rests upon a much broader base than this.

We shall not attempt an exhaustive review of our statutes, but will point out the use of this term in the body and title of our statutes, in the heading and marginal notes, and in the indices of our statutes, sufficiently to establish that the recognized statutory use of this term conforms to our view of its meaning. In the Revision of 1902 we find four references to State aid in the body of statutes. Sections 183, 184, 1368 and 3019. In the Public Acts of 1913, Chap. 25; Public Acts of 1911, Chap. 187; and Public Acts of 1903, Chap. 161, references to State aid are made in the body of the statute. In all of these instances in which this term appears in the body of the statute, it refers to pecuniary assistance. The term is used in the heading of § 3019, of § 2889, and of § 2242, of the General Statutes, and in each instance it refers to pecuniary assistance. This term is found in the title of the Public Acts of 1913, Chapters 25 and 172; Public Acts of 1911, Chap. 183; Public Acts of 1909, Chap. 82; Public Acts of 1907, Chapters 145 and 232; and Public Acts of 1905, Chap. 226. In each of these instances the statutes refer to pecuniary assistance.

The marginal notes to the following statutes contain this term, and the statutes refer to pecuniary assistance. Public Acts of 1915, Chap. 335; of 1913, Chapters 167 and 172; of 1911, Chap. 187; of 1907, Chap. 216; of 1903, Chap. 102. In the index to the Revision of 1902, under the term "State Aid," one half of the references are to direct pecuniary aid, and one half to support furnished by the State through appropriations made to that end. In the indices of the Public Acts of 1913, 1911 and 1907, this term is used in reference to statutes affording direct pecuniary aid. Neither in the Revision of 1902, nor in any Public Act thereafter, is the term "State aid" used in the sense of an exemption from taxation. We have made an examination of the statutes preceding

1902, but necessarily it has not been a completely exhaustive one, and in no single instance have we found that "State aid" was used in the statutes in the sense in which my brethren use it.   No instance of such a statutory use was pointed out to us by counsel for the beneficiaries, and none has been found by the court. Under these circumstances, no conclusion is permissible but that the use of the term "State aid" in the Public Acts of 1915 was that which had always obtained in our statutes, viz: assistance furnished by the State by direct pecuniary grant, or support furnished by the State through an appropriation duly made.

Our Private Acts show that the property of many corporations and institutions devoted to charitable purposes is, by their respective charters, exempt from taxation in whole or in part, while the property of many other corporations devoted alike to charitable purposes is not exempt.   Under the court's interpretation of "State aid," bequests and devises to all of these institutions and corporations which are not exempt from taxation and which do not receive from the State assistance either in money-grant or support, are subject to the succession tax.   So that under our law not every corporation or institution devoted to charitable ends is exempt from the payment of ordinary taxes as the court assumes, nor from the payment of the succession tax.   This inequality, which the court finds so glaring an injustice, is not relieved by the court's extension of the meaning of "State aid" to exemptions from taxation.   Again, some of these corporations and institutions are exempt in whole and some in part, indicating differences in legislative policy toward these institutions and corporations.   By the court's interpretation of "State aid," these differences are ignored, and the least exemption from taxation carries with it complete exemption from the payment of the succession tax.

The court ignores a settled legislative public policy and recognizes a public policy which has never existed. Again, some of these institutions are made exempt from taxation provided the town of their domicil so votes. These inequalities and inconsistencies, consequent upon the court's interpretation, would be avoided if "State aid" is accorded its settled statutory meaning. If it is held to include exemptions from taxation, these will be perpetuated.

Is it likely that the General Assembly intended that corporations and institutions to which it had accorded a partial exemption from taxation should, by reason of this exemption, receive complete exemption from the payment of any and all succession taxes upon bequests and devises to them, no matter how large?

The history of exemption in our succession tax legislation, far from supporting the theory that a tax exemption is "State aid," is persuasive that "State aid," as used in the Succession Tax Act of 1915, was not intended to include aid by way of a tax exemption. Our first Succession Tax Act made all property within the jurisdiction of the State subject to this tax, other than property passing by will or by the intestate law to or for the use of some charitable purpose, or purpose strictly public within the State. Public Acts of 1889, Chap. 180, § 1. Chapter 201 of the Public Acts of 1897 repealed the Act of 1889, and enacted a succession tax law which omitted this exception. Under this Act all property devoted to a charitable purpose was subject to the succession tax. So the law remained until the passage of Chapter 148 of the Public Acts of 1911, which provided that all gifts by will to or for the benefit of any corporation or institution located in this State, "which receives state aid by appropriations provided for by the general statutes, . . . shall be exempt from the payment of any succession tax." For the first

time in the history of our Succession Tax Acts, the receipt of State aid was made a condition of exemption. When the Act of 1911 was passed, State aid was given to some seventeen hospitals through appropriations made by public act. Public Acts of 1909, Chap. 118, and General Statutes, § 2852. In the session of 1911, these grants to hospitals were made through the Special Laws, and these appropriations to our hospitals comprised then, as now, the greater part of all State aid by way of appropriations by direct gift, or by support furnished. It would be futile to claim that State aid by appropriations includes aid by way of exemption from taxation.

In Chapter 231 of the Public Acts of 1913, the Act of 1911 was repealed, and it was provided that any property passing by will or inheritance in trust for any charitable purpose should be exempt from the succession tax. There has thus been nothing up to this time to indicate that the receipt of an exemption from taxation was State aid, or that it was intended in any of these Acts to include, within the exemption from the succession tax, property exempt from ordinary taxes. The Act of 1913 indicates a return to the early policy of exemption of the 1889 Act.

Chapter 332 of the Public Acts of 1915, recast the succession tax law, repealed the Act of 1913, and re-enacted the Act of 1911, except that it omitted the words "by appropriations provided for by the general statutes." The reason for the omission is apparent. Up to the passage of this Act it must be conceded that there were only two forms of State aid known to our statute law, viz: one by direct gift, and one by the furnishing of support by means of an appropriation made for that purpose. State aid by way of an exemption from taxation was unknown to our law. Prior to the session of 1911, State aid, as we have pointed out, had

been furnished certain designated hospitals by direct appropriation, and with the session of 1911, and thereafter, these appropriations were made in the Special Laws. A re-enactment, in 1915, of the Act of 1911, would have omitted from its benefits the very institutions to whom State aid had been the most generously extended. At this time it was understood that while the majority of the appropriations for State aid were made in the Special Laws, some also were made by the Public Acts, and some aid was extended by way of support made through appropriations of public moneys for that purpose. Under these circumstances, the General Assembly, desiring that bequests to all corporations or institutions receiving State aid should be exempt from the payment of the succession tax, could not limit the beneficiaries to those receiving State aid by appropriations, otherwise those receiving State aid by way of support would have been excluded; but by making the receipt of State aid the condition of exemption, it would include the two classes which had, up to that time, been the sole recipients of State aid. The reason supporting this form of exemption is found in the fact that increased payments by the State will be avoided by the exemption to institutions receiving State aid, but, in the case of institutions and corporations to whom the State makes no payment or furnishes no support, no such reason exists for making the exemption.

We do not think it is of any practical importance whether the rule of strict or liberal construction of this Act is adopted, since with either construction the result must be the same. Since the court has adopted the liberal rule of construction, it is well to instance the rule which the authorities make applicable to a case where an exemption is claimed from a general scheme of taxation. "Such exemptions are neither presumed nor allowed, unless there appears from the

language of the statute or charter to be a clear intention on the part of the legislature to make an exception to the general rule." Cooley on Taxation (2d Ed.) 204; *Ford* v. *Delta & Pine Land Co.*, 164 U. S. 662, 17 Sup. Ct. 230; *In re Hickok's Estate*, 78 Vt. 259, 62 Atl. 724. "Statutes purporting to grant exemptions from general taxation are to be strictly construed." Cooley on Taxation (2d Ed.) 205.

We agree with the Attorney-General when he says: "If the General Assembly had intended to exempt all property passing to corporations or institutions exempt from taxation, it is fair to assume that it would have expressed that intent by express language as in the New York statute . . . and in the laws of Vermont." My brethren say that it is inconceivable that the General Assembly did not in words limit the meaning of State aid if such was its intent. Until the passage of the Act of 1915, State aid, as used in our statutes, had a recognized meaning, and its use in other statutes will be presumed to be with a similar meaning unless the contrary appears. There is nothing in the Act of 1915 which tends to show that it was intended, by the use of State aid in this Act, to add to its statutory meaning assistance resulting from a tax exemption.

The Special Commission on Taxation, in its report to the General Assembly in 1917, described the tax laws enacted in 1915, as "greater both in number and importance than the General Assembly had ever before made at a single session." Among the sixteen principal changes enumerated, the "whole inheritance tax law was recast. . . . The exemptions of trusts for charitable purposes within the State, other than gifts to municipal corporations of this State for public purposes, were repealed." If this committee had thought that bequests to corporations and institutions which were tax exempt were not subject to the succession tax, it

cannot be doubted that it would have pointed out that, in spite of the repeal of the 1913 provision, the greater number of trusts for charitable purposes were not affected by this repeal. Unquestionably the committee were of the opinion that under the Act of 1915 all gifts to corporations or institutions, except those receiving aid in the way of money or support, were by the Act made subject to the succession tax. The committee further reported: "We recommend the exemption from succession taxes of all testamentary gifts to corporations created under the laws of Connecticut for charitable purposes." Would it have so reported if it had been of the opinion that all corporations exempt from taxation were in receipt of State aid? The significance of the conclusion of the committee is the greater from the fact that its chairman was former CHIEF JUSTICE BALDWIN.

Contemporaneous construction of this Act is of great weight. So far as we can learn, the claim that tax exemption is State aid has never before been raised in any proceeding, and no official has ever acted in the view that a charitable corporation which was tax exempt was for that reason in receipt of State aid.

The majority opinion finds, in the legislative history of the exemption from ordinary taxes, of property dedicated by gift to public charitable uses, a policy of Colony and State that no part of such gifts shall be depleted through the levy of a tax or the imposition of other State burden upon it; and the court finds in a present proposal to make any of these gifts subject to the succession tax, "a new and radical departure in policy in striking contrast with that which heretofore has characterized our governmental history." We fear the strong sympathy of the court with the charitable purposes of these corporations and institutions which claim an exemption from the payment of the succession tax, has momentarily caused it to forget that between

1897 and 1911 such gifts were subject to the succession tax, and between 1911 and 1913 they were so subject unless the corporations or institutions to which they were given were the recipients of State aid through appropriations under the general statutes. There was no "new and radical departure"—merely a return to a former policy of taxation.

We refrain from expressing our view upon the wisdom of imposing a succession tax upon bequests to any corporations or institutions devoted to charitable purposes. We regard that decision as within the legislative function. The General Assembly enact statutes, the judiciary do not. That Connecticut had, as a rule, exempted corporations and institutions devoted to charitable purposes from the payment of ordinary taxes, indicated a public policy as to this class of exemptions. It did not indicate a public policy as to a totally different form of raising revenue by means of death charges. Our first succession tax law was passed in 1889; necessarily our public policy as to succession taxes originated after this date. It was no part of a policy originating long before the succession tax law was passed. We have held that succession taxes are death duties, charges upon the right or privilege of devolution and not taxes upon property or person. *Nettleton's Appeal,* 76 Conn. 235, 56 Atl. 565; *Gallup's Appeal,* 76 Conn. 617, 57 Atl. 699; *Warner* v. *Corbin,* 91 Conn. 532, 100 Atl. 354, Since succession taxes are a totally different concept from the ordinary tax, it follows that a public policy concerning the ordinary tax has no relation to a succession tax. The history of our succession tax laws furnishes an unanswerable argument to the contention that the public policy of the State has been and is against making all gifts to corporations and institutions devoted to public purposes subject to the succession tax. After an experience of ten years in exempting,

from the payment of the succession tax all property of such corporations and institutions devoted to charitable purposes, the exemption was repealed and so remained for fourteen years. This change in our policy was taken with deliberation.

The General Assembly enacted the 1897 statute through its knowledge that the living often failed to pay their just share of the cost of government, and that it was justice to the State that in the final settlement of the estate of the dead the debt of the deceased to the State should, at least in part, be paid before payments should be made to the objects of his bounty, even though these were charitable trusts. We have approved of this as a legitimate reason for succession taxes, and so have the United States Supreme Court. *Hopkins' Appeal,* 77 Conn. 644, 649, 60 Atl. 657; *Plummer* v. *Coler,* 178 U. S. 115, 20 Sup. Ct. 829. That the General Assembly of 1897 intended an entire reversal of the early policy, is perfectly clear from a reading of the Acts of 1889 and of 1897. The fact that bequests to all corporations and institutions devoted to charitable purposes were, under the Act of 1897, for fourteen years subject to the succession tax, is conclusive of the existence during that time of a public policy favorable to the imposition of a succession tax upon charitable trusts of this character. The change in 1911, exempting bequests only to those corporations and institutions which receive State aid "by appropriations provided for by the general statutes," indicated a change in public policy, to the end that bequests to such of these corporations and institutions as received State aid by appropriations through the general statutes, should be exempt from the payment of succession taxes. The change in 1913 indicated a reversal to the early policy exempting gifts to all institutions and corporations devoted to charitable purposes. The change in 1915 indicated a partial reversal of the policy of ex-

Corbin *v.* Baldwin.

emption of 1913. There was no indication in the language used, or in the title or history of this Act, that it was the public policy to make gifts to every corporation and institution which was exempt from taxation, free from the payment of the succession tax.

The Tax Commission report, to which we have referred, accompanied its recommendation that all charitable trusts be made free from the succession tax, by a bill carrying out this recommendation. The General Assembly of 1917 enacted several of the recommendations of this Commission, but re-enacted the part relating to the exemption of gifts to corporations and institutions receiving State aid, just as it appeared in the Act of 1915. The General Assembly thus refused to follow the recommendation of the Commission and exempt from the succession tax "all property passing to or in trust for the benefit of any corporation incorporated under the laws of this state solely for charitable purposes." So that the latest expression of the public policy of the State is a refusal to adopt the policy which the majority opinion holds to be the established public policy of the State.

Under the court's ruling, a bequest to any corporation or institution which is exempt from ordinary taxation, in whole or in part, is free from the succession tax. And this holds, whether the corporation or institution be devoted to charitable purposes or not. Surely the General Assembly never intended to exempt gifts to business corporations from the succession tax, although the corporation might be exempt from the payment of ordinary taxes. Under the court's construction of this Act, its effect, instead of restricting the exemptions of 1913, would enlarge them beyond those known in any of our succession tax laws. The General Assembly which passed the 1915 Act faced a serious financial situation. The expenses of the State far outran its revenue. The

Governor of the State recommended, and the General Assembly passed, much taxation legislation enlarging the old, and discovering new, sources of revenue. In that crisis it would indeed have been strange had Governor and General Assembly intentionally released from the operation of the succession tax gifts to corporations which are tax-exempt but which do not receive State aid, when the amount involved was a very substantial sum. The Tax Commission of 1917 reported, as their estimate from their recommendation that bequests to Connecticut charitable corporations be made exempt from the payment of succession taxes, the following: "Reduction of Succession Taxes charged to Connecticut charitable corporations, probably on the average about $200,000." This is State history, and it tends strongly to show that the General Assembly did not intend, by the Act of 1915, to include under State aid, tax exemptions granted corporations and institutions.

We concur in the decisions upon the other points involved in these appeals.

In this opinion RORABACK, J., concurred.