This is an appeal from the board of tax review of the city of New Haven for its refusal to exempt from taxation sixteen items of property, set forth in exhibit B attached to the appeal, which the plaintiff claims were illegally added to the tax list of June 1, 1949.
The matter was heard upon a written stipulation of the parties, on file, supplemented by oral evidence presented.
The main question is whether these sixteen items of property, owned by Yale University and used by it for the housing of married veteran students, with wives and families, are non-taxable.
The properties involved are the land and buildings at 37 Hillhouse Avenue, 51 Hillhouse Avenue, 40-2 Lake Place, 46-8 Lake Place, 56-8 Lake Place, 62-4 Lake Place, 68 Lake Place, 72-4 Lake Place, 310-2 Temple Street, 325-7 Temple Street, 74, 76 and 78 Wall Street, 125-7 College Street, also known as 96 Wall Street, and thirty-two Quonset huts on Pierson-Sage Square, Whitney Avenue (exclusive of the tax-exempt land connected therewith) and sixty-eight Quonset huts on the Yale Armory tract, Forest Road (exclusive of the tax-exempt land connected with it). Until 1949, all sixteen units were tax exempt because of the educational nature of their use made. Of these, the fourteen units involving land and buildings were acquired by purchase between 1917 and 1935, of which one became a dormitory and tax exempt in 1946 when a pre-existing *Page 168 
lease expired; a second unit became tax exempt in 1949 because of its use with the museum; and the other eleven units were tax exempt because used as dormitories for periods of from fourteen to twenty-seven years. The land of the two units having the Quonset huts was tax exempt because of the educational nature of their use since acquisition thirty-seven to forty-one years ago.
The use of the Quonset huts was acquired in 1946 by contract with the federal housing administration. The title to these huts was later given to Yale.
Had these properties continued being used as formerly, apparently no question would have arisen as to their taxability.
The total assessed valuation of the properties involved in this action, added to the tax list of 1949, is $730,300.
On the tax list of 1949, the assessed value of Yale's property which was exempt from taxation was $63,972,440. However, taxes on the list of 1949 upon taxable property of Yale, payable in 1950, amount to over $140,000.
Beginning in the fall of 1945 and through 1946, the properties here in question were reconverted and subsequently occupied and used by married veteran students with their wives and children.
The claims of the city are that the use of the property here involved was thus converted to a private purpose for which Yale charged prevailing rentals, that the use made of the same is not for a public educational purpose, that the properties involved were not "granted" or "given" within the meaning of the exempting laws (General Statutes § 1775) and that the properties in question should be taxable so long as student-family use is continued.
The determinative issue is whether the property in dispute in being used by married students and their wives and families, is nevertheless devoted to the public use of education. If so, it is not taxable. If it is not so devoted and it comes within the proviso clause of § 1775, it would be taxable as so-called "productive land," as explained in Yale University v. New Haven,71 Conn. 316, 337, it being agreed that the university has and will continue to hold real estate the income of which is more than $6000 annually. *Page 169 
The parties agree that Yale University is a corporation organized under a charter granted by the colony and state of Connecticut, that Yale is now and has since 1701 been engaged in educating and instructing young men and women, residents of this and other states in the arts and sciences in conformity with its charter and with the statutes of the state of Connecticut; that the property of Yale devoted to such educational purposes is not and has not been taxable property and has been exempt from taxation under the provisions of § 1775, together with provisions of other statutes and of the charter of Yale and the constitution of the state of Connecticut; and that Yale was for many years largely supported by grants of public funds through acts of the General Assembly and that in more recent years operating deficits incurred by deficiencies in tuition fees to meet expenses have been wholly or partially met by gifts of charitably minded persons.
All the property of Yale is held and devoted to educational and charitable uses, as is declared in Yale University v. NewHaven, supra, in Corbin v. Baldwin, 92 Conn. 99, and other decisions.
All of the personal and real property of Yale held for the use of the institution is nontaxable, as is declared by § 1775, excepting only the real property described in the proviso of this section.
All the property of Yale is and always has been held, possessed, operated and managed by it subject to the public charitable trust of instructing youth "in the arts and sciences." (Act for liberty to Erect a Collegiate School, 1701).
Before and ever since the adoption of the constitution of 1818 of this state, and particularly ever since the passage in the year 1745 by the General Assembly of the "Act for the more full and Complete Establishment of Yale College, in New Haven and for enlarging the powers and privileges thereof," the property of Yale has been and now is sequestered to the public use of education (excepting only "productive real estate" described in the proviso in § 1775) and is not and has not been taxable property.
The provisions thus made for the charitable purposes of education in the case of Yale were all in pursuance of the general public policy of Connecticut declared by the General Assembly in the year 1684, ever since maintained, and now contained in the General Statute known as § 7082, sometimes variously known as the "Statute of Elizabeth" or as "The Statute of Charitable Uses" or as "The Statute of 1702." *Page 170 
The tax exemption provided for in § 1775 does not require a strict construction in favor of the sovereign but only a reasonable construction of its underlying policy.
In Yale University v. New Haven, 71 Conn. 316, 329, the court states: "The rule that laws exempting property from taxation should be strictly construed, is well-settled and is based on solid reason. But it is often referred to ... in cases where it has no application and is not in fact applied.... The rule is limited by the reasons which brought it about.... These reasons do not fully apply to the law under discussion. The non-taxation of public buildings is not the exception but the rule. The corporations, whether municipal or private, which own and are by law charged with the maintenance of such untaxed buildings, are not the recipients of special privileges, in any sense obnoxious to the law. This clause of § 3820 [Rev. 1888; see Rev. 1949, § 1761(7)] does not exempt any individuals from the burden of taxation that is common to all; it does not grant to one, particular privileges denied to all others; it declares that lands and buildings sequestered to certain public uses, i. e. taken out of the body of private property and devoted exclusively to the common good, from which no individual can derive any profit, are not taxable property. And this has been, not the exception, but the rule from the foundation of our government...." And (p. 333) the court continues: "This clause of § 3820 is not strictly so much an exemption from taxation, as the declaration of a public policy well-settled and long-established; it must therefore be construed reasonably so as to give full effect to the policy declared, as well as to avoid abuse and frustrate evasion."
This same public policy, being the underlying basis of the nontaxability of property held by Yale under its charter, therefore requires that the exemption laws in the present case must be construed, not strictly as generally is the rule with statutory exemptions, but reasonably so as to give full effect to the policy declared, as well as to avoid abuse and frustrate evasion.
An examination of the surrounding circumstances and conditions and of the intentions and purposes of those in charge of Yale, as disclosed by the evidence, which led to the use by married veteran students and their wives and families of the property here in dispute is relevant and material upon the question whether the properties are nevertheless devoted to the public use of education and tax exempt or whether they are "productive land" within the proviso of § 1775 and taxable. *Page 171 
At the end of the last World War, Yale University, as must have been the case with other colleges, was faced with an acute problem without precedent in its history. Students and candidates for admission to Yale, to the number of several thousands, had suffered interruption in their education in order to enter the armed services of the United States for periods lasting in many cases for as long as four years.
It was evident to the Yale authorities by the end of the war that the needs of the returning veterans whose education had been interrupted, together with the normal influx of those seeking college education, would tax the facilities of the university beyond anything previously experienced. The discharge of these requirements amounted to what was regarded by the Yale authorities as a real and unusual emergency.
By February, 1946, droves of veterans and candidates sought admission and readmission to Yale. Of an average age older than in normal times, many of these had been married in the course of the abnormal war conditions and had become parents.
Stimulated by the G. I. bill of rights, which made possible the return to schools of married veterans who otherwise would probably never have been able to continue their college education, the Yale student enrollment shortly after the war was over double that of the prewar population.
Aware of its public responsibility in the field of public education and of its duty to provide to the utmost limit of its capacity for education to returning veterans and candidates for college training whose service in the armed forces had compelled them to interrupt or forego college work, whether they be married or not, the university authorities were not willing to rule either that marriage of a veteran disqualified him from continuing his education at Yale or that in order to achieve it he should be further separated from his wife and children.
To the extent that it found expression in a temporary policy of the university, it was to take these married veterans back, provide accommodations for them and their families, and let them finish or undertake the education that had been interrupted or prevented. Many came from great distances. Some found lodgings for themselves in New Haven and other towns in Connecticut located as far as Greenwich. It is agreed that the housing situation in New Haven and adjoining towns was such that normal accommodations for such a large influx of veteran students and their families were wholly inadequate. *Page 172 
The seeming insuperable difficulty of finding housing accommodations for just one family unit, a common experience in ordinary daily civilian life, was multiplied many hundreds of times in the post-war and educational emergency facing the college officers, who complemented their efforts in procuring off-college facilities for the married veterans with action to provide housing facilities for them within the compass of its own facilities, which ultimately, by the fall of 1947, were housing 299 married veteran students with wives and families.
Of these, 136 married veterans with families were housed in Quonset huts on Forest Road upon the Yale armory tract, sixty-four married veterans with families were housed in Quonset huts on the Whitney Avenue property, and the balance in reconverted buildings which had been previously used mostly for dormitory purposes, located on Lake Place, Hillhouse Avenue, Temple Street, College Street, and Wall Street.
The waiting list of married students who had applied for entrance or readmission to Yale equaled double the number so accommodated.
All the Quonset huts erected had been procured from the federal public housing administration under the provisions of the Lanham Act, under contract which required their use only by United States veterans and families. Until the university became the owner of the huts, Yale accounted to the government for income and expenses and paid over to it any surplus. The cost of site preparation and equipment for the 100 huts was $109,288.28, with a reserve of $44,099.13, deemed now inadequate for their removal and restoration of the site. The huts on the Forest Road property rented for $43 per month, and those on the Whitney Avenue property for $47 per month, including heat and utilities furnished.
The cost of reconversion of the dormitory properties, other than the Quonset huts, amounted to $78,374. The rentals ranged from $32.50 to $55 monthly, with heat and utilities furnished.
The rental rates in all cases included the reconversion costs of the property, depreciated over a five-year period, but no depreciation factor for the original cost of acquiring the properties. No element covering any payment to the city of New Haven of either taxes or any amount in lieu of taxes was included in the rental rates. *Page 173 
Other elements of the established rental rates included a consideration of the ability of the student to pay and maintenance cost including utilities and heat. The rates were fixed with due regard to the policy of the university to keep the expenses of the students as low as possible.
No question as to the exempt status of the properties here in dispute would arise if they were occupied by unmarried students.
That college dormitories so used are tax exempt was settled in this state by the leading and often cited case of Yale University
v. New Haven, 71 Conn. 316 (1899). The claim of the city of New Haven in that case, that the use of property as dormitories was a business use, was rejected, the court holding that the dormitories were not commercial buildings and the fact that varying rentals were charged did not deprive them of their educational status. See also 51 Am. Jur. 598, § 622, note 2.
It remains to inquire whether, under the circumstances of this case, the fact that Yale has undertaken to furnish quarters for married veterans with wives and families divests the property here involved of the educational nature of its use.
Previous to the last world war, married students were not permitted to live in college buildings and the college furnished not quarters for them. In coping with the post-war emergency conditions, however, the college broke with this tradition to the extent mentioned. Presently, in the graduate schools, no married student is admitted unless he is a veteran, nor is a student allowed to remain who marries unless he is a veteran, unless the family lives off the college premises.
It is agreed by the parties that Yale does not intend and never has intended to continue providing housing accommodations for the families of married students after it has finished its task of caring for the educational needs of married veterans of World War II, as such task has been presented to it in the emergency here described, and that all of the facilities provided by it for this purpose were intended to be and are of a wholly temporary character, designed, constructed and operated for the sole and limited purpose indicated in coping with the post-war emergency conditions. *Page 174 
The parties further agree that it is the settled intention of the officers and governing body of Yale that as soon as the task of educating married veterans is finished, all of the Quonset huts shall be demolished and removed, and that the buildings of the properties here in question shall either be demolished and removed or be devoted to the use of dormitories for unmarried students, or to other educational uses.
It is clear that the university authorities never contemplated making any money or profit, and in fact suffered loss, from the operation of the married veteran students' quarters. For the year in question, the operation of the Quonset huts resulted in a loss of about $5,000, and the operation of the other dwelling houses in question resulted in a loss of about $10,000.
Upon the question whether the property here is intended or fitted for trade purposes, it is notable that it would not be usable for rental purposes in normal times. The two Hillhouse Avenue properties, as presently used, are by virtue of temporary zoning waivers from the city. The converted buildings, with few exceptions, require shared baths and shared kitchen facilities, and it is doubtful that established separate families would or could tolerate the close proximity of the living conditions they would be compelled to endure on these premises.
It is further conceded that Yale derives no net income from the facilities here in question, that the amount received as rent is not sufficient to pay the operating expenses and depreciation of the properties, that the over-all financial results of operations of Yale for the fiscal year ending June 30, 1949, resulted in a deficit of $525,029, that the fees of students in that fiscal year covered only approximately 44 per cent of the expenses for that period, that the balance of the current receipts was almost wholly derived from past and present gifts and that the deficit had to be and was met out of principal endowment.
The problem of the taxability of post-war emergency housing on the college level, particularly as used by married veteran students and families, presents a question of first impression in this state, and there appears to be little authority elsewhere.
The highest court of the state of New York recently considered such a problem in the case of People ex rel. ClarksonMemorial College v. Haggett, 191 Misc. 621, aff'd, 274 App. Div. 732, and 300 N.Y. 595 (1949). The college in that case *Page 175 
took over a number of private houses in the city for the housing of married members of the faculty. It was held and affirmed by the Court of Appeals that in the emergency situation with which the college was faced the use of the properties in question for faculty housing was educational in its nature and the property was accordingly tax exempt.
The considerations which there operated to support a finding in favor of the exemption of the post-war emergency housing occupied by the faculty and family (274 App. Div. 732, 734) are here applicable and pertinent upon the question of the non-taxability of the housing involved in the present case.
In the instant case, as there, it is plain that the exclusive use to which the university has devoted the property is to house married veteran students with families; that such use is one which is incident to and in direct furtherance of an expanded and unusual and temporary program of education in coping with post-war conditions; that the use of the instant properties was not merely an expedient one but necessary to the fulfillment of and was a part of that very program; that it was not a case of choosing whether to do so as a matter of business acumen or as a policy or plan to offer accommodations and conveniences to those of its married students who in turn might exercise choice in availing themselves of accommodations thus afforded; that the temporary policy of providing housing accommodations to married veteran students was a result of the lack of housing facilities in this area; that these housing accommodations were used by the married veteran students as both study and living quarters under the control and management of the university authorities; that the use of the properties here made by the university under the emergency circumstances may be considered separate and apart from the actual use which the married veteran students made of the premises: that although an element of a relationship of landlord and tenant may incidentally enter the situation, such a fact still leaves undisturbed a reasonably clear view that the actual use made by the university is incident and necessary to, and has a direct connection with, its corporate purposes.
It is also worthy of note that in the Clarkson Memorial case, supra, one of the properties in question was a trailer camp for the use of married veteran students and their wives and families and that it was held exempt from taxation. *Page 176 
The fact that the Quonset huts and reconverted buildings in the present case are not dormitories in the usual college sense is not material upon the question of their nontaxability. InMatter of Syracuse University, 124 Misc. 788, (1925), certain old houses taken over by the university and used for housing of students were held nontaxable because of the use so made of them. On page 797, the court states: "Unless it appears that the pretended educational use is merely a cloak to procure an exemption from taxes, we apprehend that the judgment of the university authorities as to the amount of property reasonably required for its educational purposes is conclusive, provided the property is actually used for those purposes and not for profit.Emerson v. Trustees of Milton Academy, 185 Mass. 414."
In our state it has been held that the governing authorities of Yale University have a broad power in determining the use of the property for charter purposes. Yale University v. NewHaven, 71 Conn. 316, 334.
In Phillips Academy v. Andover, 175 Mass. 118, 125, it was pointed out that a decision of school authorities as to what is or is not an educational use to be made of the buildings of the institution is one which the courts should be loath to disturb.
Though the question of the exemption of college property occupied and used as residences by teachers or officers of a university necessarily depends upon the particular statutory or constitutional provisions involved and the particular facts of the case under consideration, nevertheless the basic principles of those cases are helpful in the consideration of the instant matter. "As a general rule, residences for teachers erected upon or near the college grounds are held to be exempt, and similarly, the exemption of a school is not lost because the principal of the school and his family reside in the school building." 51 Am.Jur. 598, § 662.
In Phillips Academy v. Andover, supra, 123, the court says: "The distinction lies, it seems to us, between an occupancy which is for the private benefit and convenience of the officer, and which is so regarded by the parties, as in the ordinary case of landlord and tenant, and an occupancy where, although necessarily to some extent the relation of landlord and tenant enters into it, the dominant or principal matter of consideration is the effect of the occupancy in promoting the objects of the institution in the various ways in which such occupancy may or *Page 177 
will tend to promote them. In the former case the property would not be exempt, in the latter it would; and the fact that the institution incidentally derived some pecuniary advantage from the occupancy would not deprive the property of the exemption to which it otherwise would be entitled."
As an example, it is noted that in the case of Yale University
v. New Haven, supra, it was held that, "the observatory buildings, the two houses furnished by the College for the officers of the observatory, the adjoining land found to be reasonably necessary for the purposes of the observatory," together with other properties, were exempt from taxation as "buildings exclusively occupied as colleges."
Broadly speaking, it seems that the test of taxability in this regard is not whether a landlord-tenant relationship exists or whether the educational institution derives some incidental revenue from the property but rather whether, on the one hand, the occupancy promotes the educational interests of the school, or, on the other, merely a commercial relationship has been established.
It is self-evident that students and faculty are both necessary counterparts of a functioning college. In the present case, the married veteran had to be an enrolled student in order to obtain the college housing in dispute. No one not a student was or would have been provided with any of the emergency housing here involved.
Also, it is difficult to reason convincingly that housing, whether called a dormitory or court or apartment, which is unquestionably devoted to a public educational use when occupied and used by a student who is unmarried, suddenly loses the educational nature of its use when occupied, it may be assumed, by that very student, when married, even though with family attached. The marriage status may multiply and vary the nature of the use of the property but it has not lessened the educational nature of the use previously made. In either case, the occupancy by the student, whether single or married or with or without family, particularly in the face of the post-war emergency housing conditions, is one the dominant or principal and direct effect of which tends to and does directly promote the objects of the institution.
In Yale University v. New Haven, supra, 337, it was held that a college dormitory was not deprived of its character as a college building, exempting it from taxation (under the statute, *Page 178 
now General Statutes, § 1761(7), exempting from taxation buildings occupied as colleges), by the fact that a sum certain was separately charged for the use of each of the apartments therein, and it was further held that students' fees, whether apportioned to room rent or tuition, could not be treated as income of real estate, and that the dormitories, dining halls and other plant of the college so exempted was not productive real estate within the meaning of the Act of 1834 (1 Spec. Laws 481; see corresponding provisions of General Statutes, § 1775). The same reasoning there given upholding the public educational nature of the use made of the property and construing it as outside of the scope of the proviso mentioned, when occupied presumably by an unmarried student, is equally cogent here where the occupancy is by a married student and family under the unusual post-war emergency conditions confronted by the college authorities.
It appears that, as the more acute veteran pressure slackened, a few non-United States war veterans were accommodated in the housing in dispute. The number increased to eighteen up to the time of the trial. These were mainly non-United States veterans who variously had served in the armed forces of other nations, in the Merchant Marine, the Red Cross, the American Field Service and such other nonmilitary organizations associated with the war effort. They were not eligible for occupancy in the Quonset huts, which were restricted to United States veterans. All were hardship cases, however, in relation to the need for housing. These eighteen non-United States war veterans constituted but 6 per cent of the 299 married students and families accommodated in the disputed housing. Such a use under the existing emergency circumstances does not operate to divest the property of the educational character of the use being made of it, a use which under the circumstances was within the reasonable discretion of the university authorities, in their effort to cope with the post-war emergency conditions.
The new use made of the properties here involved, in being occupied by married students with wives and families during the post-war emergency, has not essentially divested the property of, nor changed, its educational status so as to render it being used for trade under the circumstances.
With apologies to Tennyson and Carlyle, it might be said that the world spins forward down the ringing grooves of change and that today is not yesterday any more. *Page 179 
The words of our Supreme Court in Mitchell v. Reeves,123 Conn. 549, 554, quoting 5 R. C. L. 323, regarding the changing scope of charitable uses has pertinency here upon the question of the changing scope of an educational use: "The enforcement of charitable uses cannot be limited to any narrow and stated formula. As has been well said, it must expand with the advancement of civilization and the daily increasing needs of men. New discoveries in science, new fields and opportunities for human action, the differing condition, character and wants of communities and nations, change and enlarge the scope of charity, and where new necessities are created new charitable uses must be established. The underlying principle is the same; its application is as varying as the wants of humanity."
For an illuminating example of the ever-expanding scope of modern education, where the changing concept of what constitutes public educational purposes goes liberally beyond a devotion of property solely to academic ends, see People ex rel.Goodman v. University of Illinois Foundation, 388 Ill. 363
(1944), where the entire modern plant of a university was held exempt from local real estate taxes.
The mere fact that there is no precedent here for use by married veteran students and families of college owned and maintained property held and devoted to the use of the university is a circumstance to be considered as to some extent indicative of the general sense of the community that it is not, or is beyond, an educational use, but the essential inquiry is not whether such a use in the past has constituted an educational use, but whether it does under existing conditions.
That Yale did not anticipate the claim of the city for taxes on the Quonset huts and include in the contract with the government a provision for a payment to the city in lieu of taxes has no pertinency to the question whether the property is devoted to a public educational use. Furthermore, the Lanham Act, (54 Stat. 1125, 42 U.S.C. § 1521 et seq.), under the terms of which Yale received the Quonset huts from the government, appears to contain no mandatory provision requiring payment to a municipality in lieu of property taxes in connection with housing facilities turned over to educational institutions (59 Stat. 1127, 42 U.S.C. § 1571 et seq.), although providing for such payment in the case of ordinary federal housing projects.42 U.S.C. § 1546. *Page 180 
Any fear, if a tax exemption is allowed in the present case, that any home or apartment house owner might be entitled to a similar tax exemption if he houses married veteran students and their families is not well founded for the reason that any such private property would not be tax exempt because not "sequestered to [the] public [use of education,] i. e. taken out of the body of private property and devoted exclusively to the common good, from which no individual can derive any profit," such as is the situation in the instant case concerning the property of Yale. (Cf. Yale University v. New Haven,71 Conn. 316, 330.)
A further claim of the city is that the property in question here is not being "exclusively" used for educational purposes and hence is not tax exempt. This qualification appears in General Statutes, § 1761(7). It does not appear in § 1775, which contains the Yale charter provisions, and the provisions of which as to tax exemptions are to be "construed reasonably so as to give full effect to the policy declared, as well as to avoid abuse and frustrate evasion." (Cf. Yale University v. NewHaven, supra, 333.) Furthermore, § 1775 expressly provides that "No provision of section 1761 concerning exemption of property used for educational purposes [being subsection 7 of the same] shall be construed to affect any provision of this section." But even if this qualification of § 1761(7), that the property shall be used "exclusively" for educational purposes to be tax exempt, should be deemed to be read together with § 1775, it does not appear that in this connection the word "exclusively" has been strictly construed. Rather, giving the effect to a reasonable construction of the policy underlying the exemption of property devoted to educational purposes, we have recognized as being within this requirement of educational use, in the above mentioned case of Yale University v. New Haven, that dormitories, dining halls, observatories, houses for observatory officers, college yards connected with college buildings (p. 334) and empty lots (p. 337) are tax exempt, all to the end that the statutes should be so applied as to give effect to the charter and statutory provisions and the public policy underlying the exemptions granted thereby. See also People ex rel. ClarksonMemorial College v. Haggett, 191 Misc. (N. Y.) 621, 624.
The defendant also questions whether the property here in dispute is property or estate which "have been or may be granted ... or given by any person or persons" to Yale so as to remain *Page 181 
exempt under § 1775. This claim applies only to the real estate and buildings on Hillhouse Avenue, Lake Place, Temple Street, College Street, and Wall Street, which were admittedly acquired by Yale by purchase. It does not apply to the Quonset huts, which the evidence shows were "given" to Yale by the federal government, nor to the lands upon which the Quonset huts are located, as no claim is being made that such lands are taxable by the city, and further because the evidence shows such lands were acquired by Yale by gift. This statute expressly provides that the funds and estate granted or given to Yale and by it invested and held to the use of such institution, together with the income thereof, shall be tax exempt, subject to the proviso therein. The effect of this provision is explained in Yale University v. New Haven, supra, 336-7. "Every dollar which Yale University has received or may receive, by gift or otherwise, is irrevocably dedicated to a public charitable use.... When the title to property vests in the University, that property `passes out of the domain of private property' and becomes devoted forever to a public charitable purpose. YaleUniversity v. New Haven, 71 Conn. 316, 333." Corbin v.Baldwin, 92 Conn. 99, 111.
No evidence appearing to the contrary, it is presumed that the land and dwellings here in question, acquired many years ago and previously used and tax exempt as dormitories, were purchased with funds and estate "granted, provided by the state, or given by ... person or persons," and hence are tax exempt within the scope and meaning of § 1775.
A consideration of the scope and purpose of tax exemptions of charitable and educational institutions as cogency.
Our Supreme Court, in Corbin v. Baldwin, supra, stated (pp. 107, 108, 109, 110): "It is to be borne in mind that exemptions are made, and can be made lawfully, only in recognition of a public service performed by the beneficiary of the exemption. They are not bestowed ... as a matter of grace or favor. If lawfully granted ... they are granted in aid of the accomplishment of a public benefit and for the advancement of the public interest. It is in recognition of their position as an agency in the doing of things which the public, in the performance of its governmental duties, would otherwise be called upon to do at its own expense, or which ought to be done in the public interest and without private intervention would remain undone.... In *Page 182 
the fullest sense of the word, the exemptions are given for assistance and help of the private endeavor in its effort to advance the public interest or to perform some share of the public governmental duty.... The extent of the public service, and of that service within the range of governmental duty, which is performed by private beneficiaries operating through the medium of tax-exempted institutions and corporations is enormous and the importance and value of it in its purely public aspects incalculable. The amount of taxes which are lost to the State and its political sub-divisions by reason of exemptions are of trifling consequence as compared with the sums coming from private sources which are spent for the public weal.... The history and service of Yale University ... furnishes a forcible illustration of the truth of the foregoing observations.... Can anyone, who reads the story of Yale's beginning and development, doubt that our fathers in founding it did so to provide what they thought to be a much needed agency of public service, that the Colony, and subsequently the State, in making direct gifts and tax exemptions in its favor, were actuated by the same high purpose, and that the tax exemptions early made through the years since maintained, were made for the conscious purpose of giving substantial aid to the undertaking whose work it was felt was and would continue to be fraught with great public benefit to the community and State?... "The public policy of this State, and of the colonial government which preceded it, has, from its early days, been governed by a recognition of the public character deserving of public assistance and support of not only Yale's work, but also of that of other educational and charitable institutions and related institutions generally.... This legislative history ... shows the longtime consistent policy of the Colony and State in not violating the ordained sanctity of property dedicated by gift of its owner to public charitable uses, by depleting its amount or effectiveness for the purpose of its dedication through the levy of a tax or the imposition of other State burden upon it."
The parties hereto have stipulated that the findings and judgment of this court in this case, subject to the right of appeal by either party, and the action of the Supreme Court of Errors in case of an appeal, shall be binding and conclusive upon the parties with respect to the properties here in question not only as to the taxable list of Yale University as of June 1, 1949, here in controversy, but also with respect to the same as to the taxable list of June 1, 1950. *Page 183 
It is agreed by the parties that the garages located on the properties at 40-42 Lake Place, 40-46 Lake Place (re 46-48 Lake Place), and 56-58 Lake Place are used by Yale for storing its own motor vehicles and other personal property, and the defendant concedes that such garages were illegally added to the tax list and that they should be removed therefrom.
The conclusions of the court are that the properties here involved are devoted and used for the public use of education, that they do not constitute "productive land" within the proviso of General Statutes § 1775, and that each of the sixteen items added to the tax list of June 1, 1949, by the assessors is not taxable.
 Judgment is hereby entered for the appellant, without costs, to recover any overpayment of taxes made to the respondent-city, and the board of tax review of the respondent-city is ordered to strike from the appellant's tax list of June 1, 1949, all the sixteen items added by the assessors thereto, as more fully set forth in schedule "B" attached to the above-entitled appeal.