CONNECTICUT SAVINGS BANK OF NEW HAVEN *v.* CITY
OF NEW HAVEN.

CONNECTICUT SAVINGS BANK OF NEW HAVEN *v.* BOARD
OF TAX REVIEW OF THE CITY OF NEW HAVEN.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

576

Argued November 8, 1944—decided February 21, 1945.

Morris Tyler, with whom was Crenna Sellers, for the appellant-appellee (plaintiff).

David S. Rivkin, with whom, on the brief, was A. Frederick Mignone, for the appellant-appellee (defendant).

JENNINGS, J. The preliminary statement above sufficiently describes the general situation. Both cases were tried together before a state referee. Both appeals are based on the overruling of remonstrances to the reports. The plaintiff claims that all of the valuations placed on the properties are too high The defendant claims that no reductions should have been granted. Ninety-seven different assessments are involved but neither side has requested detailed analysis of each individual assessment except in so far as is necessary to test the validity of the conclusions reached by the referee, with which the trial court refused to interfere. Both sides co-operated in the presentation of the evidence, and the analysis of the exhibits in the briefs of the plaintiff is skillful and thorough and has been most helpful in the study of this complicated record.

The reports in both appeals were substantially identical. They are divided into two parts. Part A may be summarized as follows: The subject properties consisted of various types but were of a kind to interest only those who bought real estate as an investment, to derive either income therefrom or a profit on resale, or both. The plaintiff had held mortgages

on all of these properties and had acquired title thereto either by foreclosure or quitclaim deeds from the owners of the equity. Nearly all of them had been sold at the time of trial. Most of the sales were in 1941. The plaintiff was not forced to sell them but it was the holder of a very large number of properties acquired by foreclosure of its mortgages and was in a sense an "unwilling holder." It proceeded to liquidate its holdings for the best prices it could obtain. The prices realized did not conclusively determine the fair market value of these properties for assessment purposes.

The experts of the plaintiff based their appraisals, made before sale, upon sales of similar and comparable properties during the years 1936 through 1941. They also applied to the subject properties methods of appraisal which utilized reproduction cost of the buildings less depreciation and obsolescence and capitalization of net and gross income.

The defendant's experts testified that during this period there was no "normal" market from which the fair market value of real property could be determined; they did not base their appraisals on sales of similar and comparable properties but, as regards buildings, upon capitalization of gross and net income and reproduction cost less depreciation and obsolescence; and they added to the values so determined the values of the land. Five per cent was a fair, reasonable and accepted percentage to be used as a factor in capitalizing net income.

There was a market for real property in New Haven between 1936 and 1941. Besides the subject properties, between two hundred and fifty and three hundred other properties comparable thereto were sold during that period, a majority of them by banks and insurance companies. Following the general business

depression in 1930, there was a very substantial decrease in the number of transfers, and the prices realized were not comparable with those obtained prior to that date. As compared with the years prior to 1930, the market in 1940 was not a "normal" market. The market between 1936 and 1941 was not such a market that sales then made could be relied on exclusively as determining the true and actual value of property over a period of years, which is deemed to be the fair market value of property for assessment purposes.

Since 1930, the assessors have reduced the assessments on nearly all of these properties, in many cases very substantially. After the bringing of the appeal from the assessment of 1940, the assessors examined the subject properties and other properties in the same area and reduced the assessment upon certain of the plaintiff's properties and certain other properties in the same area, to equalize the assessments upon the list of 1941. After the closing sessions of the board of tax review in each of the years 1940 and 1941, the board visited each of the subject properties and reviewed it in connection with the values placed upon other comparable properties. It reduced the values on twenty-nine of the properties on the list of 1940 in the gross amount of $37,875, and on seven on the list of 1941 in the gross amount of $23,165. The total assessed value of the plaintiff's property involved in these appeals was $2,210,690 and the total value as fixed by the referee was $1,954,100, a further reduction by him of $256,590. The figures are from the plaintiff's brief.

Part B of the report consisted of an analysis of each property. The following quotation is a fair sample. The last sentence appeared in each case, only the amounts varying.

"201 Bishop Street.

"This property was a one family frame house upon which the mortgage was $9975. It was insured for $14,000. Its reproduction cost of the house, less depreciation and obsolescence was $8000. The net income reasonably to be expected from the property would be $500. Capitalized at 5% the value of the property upon that method of valuation would be $10,000. The property was sold on May 5, 1942, for $6000. The land was assessed at $4000 and the building at $12,000, a total of $16,000.

"The true and actual value and fair market value of the land was $4000 and of the building $6000, a total of $10,000."

The plaintiff remonstrated against the acceptance of the report. The remonstrance requests the elimination of one fact found without evidence, asks that the report be recommitted or, in the alternative, that certain facts be added, and claims that in any event the report should not be accepted for reasons apparent on its face. One ruling on evidence was also included in the remonstrance but this was not pursued in the brief. The motion to recommit was denied, the remonstrance was overruled and judgment was entered on the report. The assignments of error, in substance, make these rulings the subject of the appeal. Its consideration is simplified by the preliminary statement of the question presented in the plaintiff's brief:

"(1) In an appeal from the doings of a Board of Relief claiming excessive assessment where a market for the property in question is found to exist, is it error for the trier of fact to consider evidence of value computed by those methods approved for use only in cases where concededly there is no market?

"(2) Was it error in any case for the trier to find values almost uniformly so far in excess of the evi-

dence of market value as to show that he gave little or no weight to such evidence?"

The rules for the determination of the amount for which property should be assessed have a very considerable legislative history. The present method of basing taxation upon the valuation of property by assessors originated in Chapter 2 of the Public Acts passed at the May session, 1819. According to the statute in force in 1821, dwelling houses were to be set in the list "valued at the rate which each separate dwelling-house and lot . . . are worth in money, and with due regard to the situation, use and income thereof." Statutes, 1821, p. 446, § 2. Market value first appears in Chapter 47 of the Public Acts of 1851. Section 7 provides that dwelling houses "shall be valued and assessed according to the present true and just value thereof." Section 8 defines this as follows: "The present true and just value of any estate, either real or personal, liable to be assessed by virtue of the provisions of this Act, shall be deemed and taken by the assessors and board of relief of the several towns, to be the fair, market value thereof, being the price which could be obtained therefor at private sale, and not its value at a forced or auction sale." General Statutes, Rev. 1875, p. 155, § 13, provides that dwelling houses are "to be set in the list at their present true and actual valuation." This was defined by § 17 (p. 156) as follows: "The present true and just value of any estate shall be deemed by all assessors and boards of relief to be the fair, market value thereof, and not its value at a forced or auction sale." The present law, General Statutes, §§ 1143, 1149, makes no change in the first sentence but the second is made to conform thereto and the comma after "fair" is omitted, so that it reads, "The present true and actual value of any estate shall be deemed

by all assessors and boards of relief to be the fair market value thereof, and not its value at a forced or auction sale." If these omissions and changes have any significance, they tend to emphasize the importance of the common phrase "fair market value" as the criterion. The reference to a private sale, which might indicate a single transaction, is omitted. Read together, these sections mean that the basis of valuation of real estate for taxation purposes is the "present true and actual valuation"; § 1143; and, in arriving at that valuation, the ordinary basis is what the property would bring in a fair market; *Underwood Typewriter Co.* v. *Hartford,* 99 Conn. 329, 334, 122 Atl. 91; not what it would bring at a forced sale.

"The expressions actual value, market value, or market price, when applied to any article, mean the same thing. They mean the price or value of the article established or shown by sales public or private in the way of ordinary business." *Sanford* v. *Peck,* 63 Conn. 486, 493, 27 Atl. 1057; *Underwood Typewriter Co.* v. *Hartford,* supra; *Stoll* v. *Judd Co.,* 106 Conn. 551, 560, 138 Atl. 479; *Portland Silk Co.* v. *Middletown,* 125 Conn. 172, 174, 4 Atl. (2d) 422; *Manila Ry. Co.* v. *Fabie,* 17 Philippine R. 206, 208; 38 C. J. 1262, § 17. The cost of property is relevant evidence of its fair market value; *McMahon* v. *Plumb,* 88 Conn. 547, 550, 92 Atl. 113; and the best test is ordinarily that of market sales. *New Haven Trust Co.* v. *Doherty,* 74 Conn. 468, 472, 51 Atl. 130; *Campbell* v. *New Haven,* 101 Conn. 173, 185, 125 Atl. 650; note, 118 A. L. R. 869. The value of property is dependent on many factors and is, in the final analysis, a matter of opinion. *Lomas & Nettleton Co.* v. *Waterbury,* 122 Conn. 228, 233, 188 Atl. 433. All of the evidence, including that of the experts and of sales, "is to aid the trier to arrive at his own conclusion, which is to

be reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value, and his own general knowledge of the elements going to establish it." *Appeal of Cohen,* 117 Conn. 75, 85, 166 Atl. 747; *Cohn* v. *Hartford,* 130 Conn. 699, 705, 37 Atl. (2d) 237.

In this case, the referee found the true and actual value and fair market value of the subject properties, that is, his conclusion was phrased in the very words of the statute. Furthermore, he stated that "The prices realized in sales of comparable properties and of the subject properties themselves, the reproduction cost of the buildings less depreciation and obsolescence, and the result reached by capitalizing the gross and net income of the properties have all been considered and given weight as proper factors to be used by the experts in making their estimates of value and by the Referee in determining whether the assessments of the various properties were excessive as alleged." The basic complaint of the plaintiff is that, in spite of this conclusion and of the statement of the method by which it was reached, the record conclusively proves that the referee, if he considered market value at all, did so only to discard it as a guide on the ground that it was a depressed market—an improper consideration.

In support of this contention, the plaintiff points to the following facts found in the report: There was a market for real property in New Haven between 1936 and 1941; there was evidence of sales of the subject properties for the best prices the plaintiff could obtain; there was evidence of sales of two hundred and fifty to three hundred other properties of types comparable to the subject properties during this time. The facts disclosed by the exhibits, as distinguished from opinions and conclusions, were not in dispute. A table in the plaintiff's brief showing the percentage

of excess of the referee's valuation over market value, as evidenced by the sale price or appraisal by the plaintiff's experts based on comparable sales, results in an average of 56.5 per cent. If the few cases included in the table where the plaintiff's appraisal rather than a sale was relied on are deleted, as based on opinion, the result is not materially different. This was after an overall reduction on all properties by the referee of 12.9 per cent. The valuations found by the referee in practically all cases bear a close relationship to the result obtained by accepting the evidence of reproduction cost less depreciation or capitalization of net income, but little, if any, similarity to fair market value as claimed by the plaintiff.

None of these arguments suffices to overthrow the factual conclusions of the referee. It is true that he found that a market existed. He did not find that it was a fair market. He found specifically that the prices realized in this market "did not conclusively determine the fair market value of the properties for assessment purposes." The valuation of property for assessment purposes has been a vexed and much litigated problem, as is indicated by the briefs of the parties. In general, in this state, its solution has been left as a question of fact for the trier, always provided that no rule of law has been violated. This is understandable when the safeguards employed are considered. The valuation is first fixed by the assessors. An appeal lies to the board of tax review. Both of these boards are usually elected bodies. A taxpayer who thinks he is aggrieved then has an appeal to the courts, where the matter is tried de novo. General Statutes, Cum. Sup. 1935, § 374c; Cum. Sup. 1939, § 108e. The statutes provide, in part, that "The court shall have power to grant such relief as shall to justice and equity appertain," and, if it finds that property has

been in fact overvalued, it has power to, and should, correct the valuation. *White* v. *Portland,* 63 Conn. 18, 22, 26 Atl. 342; *Ives* v. *Goshen,* 65 Conn. 456, 459, 32 Atl. 932; *Lomas & Nettleton Co.* v. *Waterbury,* supra; *Portland Silk Co.* v. *Middletown,* supra. As an illustration of the extent to which factual findings are supported, in the last case cited a finding of the referee reducing the assessment on the plaintiff's property from $104,500 to $45,000 was sustained. In *Underwood Typewriter Co.* v. *Hartford,* supra, error was found in the value fixed by the trier because it was based on market value when there was no market. *Somers* v. *Meriden,* 119 Conn. 5, 174 Atl. 184, emphasizes (p. 13) the great discretionary power of the Superior Court in appeals of this nature.

The plaintiff relies strongly on *Portland Silk Co.* v. *Middletown,* supra. It was there held (p. 175) that a depressed market was still a market. If the record showed definitely that the values in this market were disregarded by the referee because the market was depressed, the contention of the plaintiff that the referee arrived at his conclusion by applying an erroneous rule of law would be correct. Reading the report as a whole, this does not follow. It states that the prices realized in sales of comparable properties and of the subject properties themselves were considered. The arguments of the plaintiff, while persuasive, do not require a finding of error in this regard, especially in view of the underlying principle, referred to above, of regarding the decision of those questions as issues of fact, and market value as but evidence in relation thereto.

It is important to note that the case at bar is not the usual one where the assessment, perhaps through inertia, remains the same year after year, regardless of

depreciation and changing conditions. As above stated, values were lowered by the assessors beginning in 1930, and the substantial reductions made by them, the board of tax review and, on the evidence presented, the referee show that the facts and arguments advanced by the plaintiff were given due consideration. It cannot be said that the facts found in the report, supported by the exhibits, sustain the plaintiff's basic claim that the conclusions of the referee were reached by methods not recognized in law. There was no error in overruling the plaintiff's remonstrance.

The remonstrance of the defendant was also overruled. Its assignments of error based on this action are summarized in its brief under four heads. The first three relate to allegations of the plaintiff that the assessments were disproportionate and unlawful. The referee found that no evidence was offered by the plaintiff that the assessments were disproportionate or that they were unlawful otherwise than on the ground that they were excessive. The issue of disproportionate assessment is therefore not in the appeal and that of unlawful assessment is disposed of by the foregoing opinion on the plaintiff's appeal. The remaining assignment complains of the reduction of the assessment without finding that the assessors and board of tax review acted unreasonably or arbitrarily. As has been pointed out, this is not the issue on tax appeals. There is no error on defendant's appeal.

There is no error on either appeal.

In this opinion BROWN, ELLS and DICKENSON, Js., concurred.

MALTBIE, C. J. (dissenting). I do not think that there is any substantial difference between the majority of the court and myself upon the principles of

law applicable in these cases. My unwillingness to concur is because I cannot read the report of the referee without concluding that he took into consideration inadmissible elements in determining the values of the properties in question.

Market value as applied generally to a piece of land, particularly if there is a building upon it, has a very different significance than when used, for example, with reference to a security sold upon an exchange. "Market" as applied to land usually means no more than that it is salable within a reasonable time and upon reasonable opportunity afforded to possible purchasers; and value is represented by the price which probably would be paid for the particular piece of property as a result of fair negotiations between an owner who is willing to sell and a buyer who desires to buy. *Portland Silk Co.* v. *Middletown,* 125 Conn. 172, 175, 4 Atl. (2d) 422. The referee found that during the period in question, 1936 to 1941, there had been numerous sales of real property in New Haven, including sales of many of those whose values are in issue in these cases. He concluded that there was a market for the lands in question. But he then proceeded, as I read the report, heavily to discount, if not largely to disregard, the prices realized upon these sales upon two grounds. The first was that most of the sales were of properties held by banks and insurance companies; the referee evidently considered that these sales were by owners more than merely willing to sell, and that in weighing the evidence of the prices received he could properly take that circumstance into account. The other consideration which he gives as a reason for discounting the prices as evidence of value was that the sales were made in a "depressed market," in a market not "normal," compared with that in the years before 1930. It seems to me that the referee erred here. It

is, in the words of the statute, the "present" true and actual value which should be the basis of the assessment. To disregard the price which would be realized on a present sale because the market at the time is "depressed" means no more than that value is determined, not upon the basis of the fair price for which the property could be presently sold, but upon the price it might have brought at some indefinite time in the past or might bring at some indefinite time in the future. Such a standard of valuation would not only not accord with the statute but would also be clouded with an extreme of uncertainty. That the referee definitely adopted it is indicated by the further statement in the report that the test was the value of property "over a period of years." Moreover, to discount prices received for properties as evidence of value because the sales were made in a "depressed" market actually gives double weight to the circumstances which have caused a more or less temporary decline in values. The price received upon a fair sale of property must be assumed to have resulted from a consideration of "all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land"; Andrews v. Cox, 127 Conn. 455, 458, 17 Atl. (2d) 507; and among those considerations undoubtedly would be the likelihood or unlikelihood that within some reasonable time in the future there would be a general increase in the prices paid for similar properties. The fact that sales of property are made in a market which is "depressed" as regards other years does not seem to me a circumstance which can properly affect the weight to be given to the prices received as evidence of value.