YALE UNIVERSITY *v.* CITY OF NEW HAVEN

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and BARBER, Js.

Argued June 4—decision released September 2, 1975

*Roger J. Frechette,* for the appellant (defendant).

*Robert F. Cavanagh,* with whom was *S. Robert Jelley,* for the appellee (plaintiff).

House, C. J.  This case arose as an appeal by the plaintiff from a decision of the board of tax review of the defendant city which denied the plaintiff's application for relief from the action of the defendant's assessor in adding to the defendant's 1969 tax list premises known as 149 York Street, New Haven, together with the personal property located therein. By amendment, the appeal, before it was heard, included the same addition to the tax lists of 1970, 1971, and 1972.  The real property was used by the plaintiff exclusively to house the Yale University Press and for the storage and display of part of one of the collections of the Yale University Art Gallery.  The appeal was referred by the Court of Common Pleas to a state trial referee, Hon. John R. Thim, for hearing and judgment.  From the judgment for the plaintiff, the defendant appealed to this court.  The following facts are summarized from the court's finding: Yale University is a corporation organized under a charter granted by the colony and state of Connecticut and is located in the town of New Haven.  The charter of Yale contains the following provisions:  "[T]he funds

which have been, or may hereafter be, granted, provided by the State of Connecticut, or given by any person or persons, to the corporation of 'The President and Fellows of Yale College in New Haven,' and by them invested and held for the use of that Institution, shall, with the income thereof, be and remain exempt from taxation. *Provided,* however, that the said corporation shall never hold in this State, real estate free from taxation affording an annual income of more than six thousand dollars."

Yale is organized into a number of schools and departments. One of these departments is Yale University Press which has been a department since 1961. The predecessor of the department of Yale known as the Yale University Press was first organized in 1908 as a New York stock corporation bearing the name Yale University Press. On March 15, 1954, the directors of the New York stock corporation named Yale University Press voted to dissolve the corporation and to turn its assets over to a Connecticut nonstock corporation to be named Yale University Press, Incorporated. On April 26, 1954, Yale University, its sole stockholder, also voted to dissolve the New York stock corporation named Yale University Press and to turn its assets over to a Connecticut nonstock corporation to be named Yale University Press, Incorporated. The articles of association of the Connecticut nonstock corporation Yale University Press, Inc., were approved by the secretary of the state of Connecticut on August 13, 1954. In 1961, the Connecticut nonstock corporation Yale University Press, Inc., was dissolved and its assets, including its real estate at 143 Elm Street, New Haven, were turned over to Yale University. On April 8, 1961, the Yale cor-

poration adopted articles of government for the department of Yale known as Yale University Press. Under the articles of government, the Yale University Press has been managed since 1961 by a board of governors selected annually by the Yale corporation.

The department of Yale known as the Yale University Press has a full-time manager, known as the director, who is appointed by the Yale corporation. The position of director of the Yale University Press is considered similar to the positions of director of the Yale University Art Gallery, director of the Peabody Museum of Natural History, and librarian of the University. The board of governors of the Yale University Press appoints a committee on finance which has concern with the financial affairs of the Yale University Press. The board of governors also appoints a committee on publications, which has the sole authority to recommend what publications shall be issued under the imprint of the Yale University Press. The articles of government provide that at least two-thirds of the members of the committee on publications shall be members of the faculty of Yale. At the time of the trial, eight of the nine members of the committee on publications were members of the faculty at Yale. The ninth member was the director of the Yale University Press.

On and prior to October 1, 1969, and continuously thereafter until July 1, 1972, the operations and functions of the Yale University Press consisted of the publishing of scholarly books and the operation of a printing office which did most of the printing work required by Yale and printed some of the books published by the Yale University Press.

On July 1, 1972, a new department known as the University Printing Service was organized by Yale, and it took over all of the printing work formerly done by the Yale University Press. From and after July 1, 1972, the operations and functions of the Yale University Press have consisted entirely of the publication of scholarly books.

In 1959, Yale purchased for $200,000 the real property known as 149 York Street, which is the subject of this appeal. It was paid for from gifts received by Yale. The real property at 149 York Street was used, from the time of its purchase until February, 1973, exclusively for the purpose of housing the Yale University Press and for storage and display of part of the Yale University Art Gallery's Garvan Collection of American Furniture, and related objects, except that after July 1, 1972, the printing office located there was under the jurisdiction of the University Printing Service. The real property at 149 York Street consists of a two-story and basement building of approximately 54,000 square feet, and the land on which it stands. Approximately 10,000 square feet of space in the building have been used at all relevant times for storage and display of part of one of the collections of the Yale University Art Gallery known as the Garvan Collection of American Furniture, and related objects. The balance of the building has been occupied at all such times by the Yale University Press, except that, after July 1, 1972, the printing office was under the jurisdiction of the University Printing Service. The facilities at 149 York Street which house part of the Garvan collection have been used for the teaching of graduate and undergraduate courses in American arts and for the display of the Garvan collection. The per-

sonal property located at 149 York Street consists of printing office machinery, furniture and fixtures, and books and supplies of the Yale University Press.

From the time that Yale acquired the real property at 149 York Street in 1959 until the list of October 1, 1969, neither the real property nor the personal property located there was assessed or taxed. Yale's use of the property at 149 York Street remained the same from 1959 through December 31, 1972, except for the transfer of the printing functions from the Yale University Press to the University Printing Service on July 1, 1972. The assessor's action adding the property to the taxable list as of October 1, 1969, was not prompted by any change in the use of property. On and prior to October 1, 1969, and continuously thereafter until July 1, 1972, the department of Yale known as the Yale University Press maintained a printing office at 149 York Street. The printing office printed materials required by many of the schools and other departments of Yale, including bulletins, catalogues, reports, departmental letterheads and forms. The printing office also printed some of the books published by the Yale University Press. It did not do any commercial printing. The facilities of the printing office were used by Yale in connection with the graphic arts courses offered to students at Yale. In addition to the operation of the printing office, the function of the department at Yale known as the Yale University Press at all relevant times has been to publish and distribute scholarly books. Its articles of government provide that: "It is the purpose of the Press, as a department of Yale University, to manufacture, print, produce and reproduce, and to publish and dis-

tribute books and other publications suitable to be published under the auspices of 'Yale University, a corporation organized and existing under a special charter granted by the General Assembly of the Colony and State of Connecticut and located in the Town of New Haven'; and in carrying on these activities, to act as an integral part of the educational and scholarly functions of Yale University consistently with the general charitable, educational, literary, and scientific purposes of Yale University as set forth in its charter, thus supplementing the labors of scholars in the discovery and dissemination of truth, which is the central purpose of Yale University. The publications of the Press are primarily works by authors of originality and outstanding competence in their respective fields, and suitable works of erudition or academic scholarship and serious import which contribute to an understanding of human affairs, with first consideration to quality and with particular attention to works by members of the faculty of Yale University and of other colleges and universities which should command the respect of scholars. The Press is designed to provide an outlet for books which might not otherwise be published, to encourage the preparation of such works, and thus to exert a dynamic influence, by increasing the range and vigor of scholarly activities within Yale University and elsewhere, and so operate as an essential factor in the high functions of Yale University and other institutions of learning." At all relevant times, the Yale University Press has applied the foregoing standards in the selection of works for publication.

The Yale University Press publishes only works which have been recommended for publication by the committee on publications of the board of gov-

ernors. That committee considers only the scholarly merit of a book and does not take into account either the cost of publishing the book or the likelihood of return in terms of sales. The plaintiff introduced into evidence a list of all books published by the Yale University Press from July, 1968, to June, 1972. Two hundred eight of the three hundred sixteen books published during that period were written by members of the Yale faculty, were based upon Yale dissertations, were sponsored by Yale academic departments, or were otherwise directly connected with Yale. Yale holds endowment funds which are required to be used for the benefit of the activities carried on by the Yale University Press. One hundred sixty-four of the three hundred sixteen books published from July, 1968, to June, 1972, were published by the Yale University Press with assistance from these endowment funds. Forty-nine books were published with the assistance of funds made available by other Yale departments or gifts and grants made to Yale from outside sources for that purpose. The printing and publishing activities of the Yale University Press carried on at 149 York Street for the period from July 1, 1961, through June 30, 1972, resulted in a net loss, in each fiscal year except the year July 1, 1964, to June 30, 1965, as follows: 7/1/61–6/30/62, $208,290; 7/1/62–6/30/63, $71,264; 7/1/63–6/30/64, $12,877; 7/1/64–6/30/65, $4,450 (profit); 7/1/65–6/30/66, $24,138; 7/1/66–6/30/67, $125,290; 7/1/67–6/30/68, $35,704; 7/1/68–6/30/69, $69,135; 7/1/69–6/30/70, $47,040; 7/1/70–6/30/71, $223,731; 7/1/71–6/30/72, $281,181. The aggregate net loss for the six-year period from July 1, 1966, through June 30, 1972, was $782,081. The above figures do not reflect any rental or depreciation charges for the real

property occupied by the Yale University Press, Yale's general administration expenses allocable to the Yale University Press, or certain pension costs. The Yale corporation has determined that the publication of scholarly works through the Yale University Press is an essential and integral part of Yale's educational function.

On the basis of the foregoing facts, the trial court concluded that the real and personal property of Yale at 149 York Street was nontaxable on the lists of 1969, 1970, 1971, and 1972, under the charter of Yale, as amended, and under § 12-81 (8) of the General Statutes[1] and that Yale was entitled to judgment reimbursing it for all amounts paid by it on account of taxes assessed against that property on the lists of 1969, 1970, 1971, and 1972, with interest from the respective dates of payment.

The defendant has assigned error to the court's refusal to find the facts set forth in fifty-three paragraphs of the defendant's draft finding, which facts the defendant claims were admitted or undisputed. This court has the power to correct a finding

---

[1] "[General Statutes] Sec. 12-81. EXEMPTIONS. . . . (8) College Property. The funds and estate which have been or may be granted, provided by the state, or given by any person or persons to the Trustees of the Berkeley Divinity School, the board of trustees of Connecticut College for Women, the Hartford Seminary Foundation, Sheffield Scientific School, Trinity College, Wesleyan University or The President and Fellows of Yale College in New Haven, and by them respectively invested and held for the use of such institutions, with the income thereof; provided none of said corporations shall hold in this state real estate free from taxation affording an annual income of more than six thousand dollars. Such exemption shall not apply to any real estate which said Trustees of the Berkeley Divinity School own, control or hold in trust, and which is situated in the city of Middletown. No other provision of this section concerning exemption of property used for educational purposes shall be construed to affect any provision of this subdivision . . . ."

where it fails to include admitted or undisputed facts. Practice Book § 627; *Morrone* v. *Jose,* 153 Conn. 275, 277, 216 A.2d 196; *National Broadcasting Co.* v. *Rose,* 153 Conn. 219, 223, 215 A.2d 123. A fact, however, is not admitted or undisputed simply because it is uncontradicted. *Freccia* v. *Martin,* 163 Conn. 160, 162, 302 A.2d 280. Furthermore, to secure an addition to the finding the defendant must point to some part of the appendix, the pleadings or an exhibit properly before the court which discloses that the plaintiff admitted the truth of the fact or that its validity was conceded to be undisputed. *State* v. *Warren,* 169 Conn. 207, 214, 363 A.2d 91; *O'Brien* v. *Board of Tax Review,* 169 Conn. 129, 133, 362 A.2d 914. The trial court is the judge of the credibility of witnesses. That a fact was testified to does not make it an admitted or undisputed fact. *Stoner* v. *Stoner,* 163 Conn. 345, 347, 307 A.2d 146. Further, if the claimed additions are implicit in the findings or are facts not material to the issues in the case, the trial court is not required to include them in the finding. *Charter Oak Estates, Inc.* v. *Kearney,* 160 Conn. 522, 525, 280 A.2d 885; *Martin* v. *Kavanewsky,* 157 Conn. 514, 516, 255 A.2d 619. A careful review of the evidence printed in the appendices to both briefs indicates that the additions sought by the defendant are either implicit in the finding or are not material, admitted or undisputed.

The defendant next assigns error to all or part of twenty-three paragraphs of the court's findings, asserting that they were found without evidence. Such a claim is tested by the evidence printed in the appendices to the briefs. *State* v. *Brown,* 163 Conn. 52, 55, 301 A.2d 547. Upon examination of the evidence in the appendices to the briefs of the

parties, some of which appears in the foregoing recitation of facts, it is clear to us that this claim of the defendant is without merit.

The defendant next assigns error to all seven of the conclusions reached by the trial court, asserting that the facts set forth in the finding do not support them. All but three of these conclusions are treated elsewhere in this decision and require no discussion here. These remaining three conclusions are: The plaintiff did not operate a commercial printing and publishing business. The real property is not productive real estate since it is used by Yale for educational purposes. The real estate did not afford an annual "income of more than six thousand dollars."

Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not by the evidence. *Hames* v. *Hames,* 163 Conn. 588, 592, 316 A.2d 379; *Hutensky* v. *Avon,* 163 Conn. 433, 437, 311 A.2d 92. Conclusions logically supported by the finding must stand. *Freccia* v. *Martin,* supra. From the facts found by the court which are recited above, it is clear that the court's conclusions are amply supported by the facts and do not violate law, logic or reason.

The defendant's remaining assignments of error attack the judgment rendered by the court and the procedure by which the appeal was taken from the board of tax review to the court.

We address ourselves to the procedural issue first; it is the defendant's claim that the plaintiff did not have a right to appeal under § 12-118 of

the General Statutes either to the board of tax review or to the Court of Common Pleas and thus those bodies were without jurisdiction over the subject matter of the appeal. Appeals to the board of tax review are governed by § 12-111 of the General Statutes and appeals from that body to the Court of Common Pleas are controlled by § 12-118. A reading of these statutes clearly demonstrates that the plaintiff had a right to appeal, and the board of tax review and the Court of Common Pleas had jurisdiction to hear that appeal. The defendant's next claim is that the plaintiff's appeal to the Court of Common Pleas should not have been treated as a trial de novo but rather as an administrative appeal and that certain evidence offered on appeal to the Court of Common Pleas should not have been admitted as that evidence was not before the board of tax review. Our own decisions are clear on this issue. "A taxpayer who is aggrieved by the decision of the board of tax review has an appeal to the courts where the matter is tried de novo." *Hutensky* v. *Avon,* supra, 436; see also *Sibley* v. *Middlefield,* 143 Conn. 100, 106, 120 A.2d 77; *Connecticut Savings Bank* v. *New Haven,* 131 Conn. 575, 584, 586, 41 A.2d 765. The plaintiff was entitled to a trial de novo, and the defendant's objections to the introduction of evidence by the plaintiff were properly overruled.

Lastly, the defendant claims error in the ultimate conclusion and judgment of the court removing the property in question from the city of New Haven's tax list for the years 1969–1972 and allowing Yale University to recover the amounts paid in taxes for those years on the property at 149 York Street.

The taxability of property owned by Yale University is governed by the charter of Yale as con-

firmed in the constitution of Connecticut, article eighth, § 3, and by § 12-81 (8) of the General Statutes, which we have printed in footnote 1, supra. This court has had occasion to construe the language of § 12-81 (8) as well as the pertinent section of the Yale charter. *Yale University* v. *New Haven,* 71 Conn. 316, 42 A. 87. That section of the charter provides as follows: "[F]unds which have been, or may hereafter be, granted, provided by the State of Connecticut, or given by any person or persons, to the corporation of 'The President and Fellows of Yale College in New Haven,' and by them invested and held for the use of that Institution, shall, with the income thereof, be and remain exempt from taxation. *Provided,* however, that the said corporation shall never hold in this State, real estate free from taxation affording an annual income of more than six thousand dollars." Public Acts 1834, c. 25. In the case of *Yale University* v. *New Haven,* supra, 335, Justice Hamersley, speaking for a unanimous court, wrote that "[t]he charter [and the statute], in the broadest terms, exempts all the property of the College from taxation. . . . [I]ts main purpose was to exempt all estate and funds invested and held lawfully, i.e., 'for the use of the College,' including both principal and income. The only limitation on this absolute exemption is contained in the *proviso*: '[*Provided*], however, that [the] said corporation shall never hold in this State, real estate free from taxation affording an annual income of more than six thousand dollars.'" The court went on to say that "[t]he Act of 1834 plainly exempts all the property of the College from taxation; and the *proviso* qualifies this exemption only for the purpose of imposing a limited restraint on the mode of investment. It

is not an absolute limitation to the holding of real estate, but it is a provision which makes it the interest of the College to itself limit its holding. It is not presumed that the College will, to any considerable extent, invest its funds in unproductive property, so there is no direct limit to its holding of such land; but the College might well be tempted to put all its funds into productive real estate, and the *proviso* directly restrains this tendency by limiting its right to hold real estate producing more than $6,000 a year, unless it pays taxes on the excess. If the College finds in any year that its revenues from land exceed $6,000, it must choose between its unlimited exemption from taxation and its unlimited right to hold real estate; if it chooses the former it must sell so much of its productive land as will reduce its income within the limit, if it chooses the latter, it must pay taxes on the land instead of selling it. In this way the State sought to exempt all the funds of the College from taxation, and through the potent operation of self-interest to keep the investment of those funds in real estate within reasonable bounds." *Yale University* v. *New Haven,* supra, 336. Our trial courts have continued to follow the precepts of Justice Hamersley's decision and have rejected attempts to tax Yale's property. *Yale University* v. *West Haven* (Superior Court, New Haven County, No. 37889, 1935); *Yale University* v. *New Haven,* 17 Conn. Sup. 166.

The defendant also argues that § 12-81 (7)[2] of the General Statutes should be read together with

[2] "[General Statutes] Sec. 12-81. EXEMPTIONS. . . . (7) Property Used for Scientific, Educational, Literary, Historical or Charitable Purposes. Subject to the provisions of sections 12-87 and 12-88, the real property of, or held in trust for, a Connecticut corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used

§ 12-81 (8) with the result that the "use" referred to in § 12-81 (8) must be an "exclusively . . . educational" use under § 12-81 (7) in order to qualify for tax exemption. The legislature, however, apparently foreseeing such an argument, provided in § 12-81 (8) that "[n]o other provision of this section concerning exemption of property used for educational purposes shall be construed to affect any provision of this subdivision." Thus § 12-81 (8) must be interpreted apart from any of the other subsections of § 12-81.

Therefore, although the trial court concluded that the real property at 149 York Street was used for educational purposes, it is unnecessary for us even to discuss that issue. Under the terms of the statute and the charter of Yale, to qualify for an exemption, it is enough that the property of Yale be held for the use of that institution provided that real estate affording an annual income of more than six thousand dollars is not exempt.

The facts of the instant case clearly meet the foregoing criteria. The real and personal property at 149 York Street is owned and used by Yale University and the real property does not afford an annual income of more than six thousand dollars.

exclusively for carrying out one or more of such purposes and the personal property of, or held in trust for, any such corporation, provided (a) any officer, member or employee thereof does not receive or at any future time shall not receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiary of its strictly charitable purposes, and provided (b) in 1965, and quadrennially thereafter, a statement on forms prepared by the tax commissioner shall be filed on or before the last day required by law for the filing of assessment returns with the local board of assessors of any town, consolidated town and city or consolidated town and borough, in which any of its property claimed to be exempt is situated . . . ."

Therefore, that property is exempt from taxation by the city of New Haven. Despite the resourcefulness and vigor with which counsel for the defendant has pressed the claims of his client, we find no error in the conclusions and judgment of the trial referee.

There is no error.

In this opinion COTTER, LOISELLE and BARBER, Js., concurred.

BOGDANSKI, J. (concurring). I concur with the result in this case but not with the reasoning employed in the majority opinion. The majority holds that real property owned by Yale is entitled to a tax exemption whether or not it is used for educational purposes. That conclusion is unwarranted under the law and contrary to sound public policy.

Section 12-81 (8) of the General Statutes exempts from taxation the funds and estate of Yale and other institutions of higher learning which are "invested and held for the *use* of such *institutions.*" (Emphasis added.) The charter of Yale, as amended in 1834, also exempts from taxation the funds granted or given to Yale which are "invested and held for the *use* of that *Institution.*" (Emphasis added.) The "use" referred to must be construed to mean the proper educational uses for which Yale was formed. The original act of 1701 incorporating Yale College was for the expressed intent of "founding and suitably endowing and ordering a Collegiate School within his Majesties Colonie of Connecticutt, wherein youth may be instructed in the arts and sciences, who through the blessing of Almighty God, may be fitted for publick imployments both in church and civill state." 4 Col. Rec.

363; see 1 & 2 Private Laws 472. The subsequent history of the charter of Yale University is extensively treated in *Yale University* v. *New Haven,* 71 Conn. 316, 326–27, 42 A. 87, and need not be repeated here except to stress that the original intent to accomplish a public benefit and advance the public interest has not been changed by later revisions of Yale's charter.

The tax exemption granted to Yale pursuant to its charter has been loosely described as exempting "all the property of the College from taxation." *Yale University* v. *New Haven,* supra, 336. In that opinion, however, Justice Hamersley stated that "its main purpose was to exempt all estate and funds invested and held lawfully, i.e., 'for the use of the College.' " *Yale University* v. *New Haven,* supra, 335. That latter statement is more precise and in accord with the law, for tax exemptions can lawfully be granted "only in recognition of a public service performed by the beneficiary of the exemption. They are not bestowed, as is too often unthinkingly supposed, as a matter of grace or favor. If lawfully granted, as most are, . . . exemptions are given for the assistance and help of the private endeavor in its effort to advance the public interest or to perform some share of the public governmental duty." *Corbin* v. *Baldwin,* 92 Conn. 99, 107, 101 A. 834.

The furnishing of education for the general public is a state function and duty. *Bridgeport* v. *Agostinelli,* 163 Conn. 537, 550, 316 A.2d 371; *State ex rel. Board of Education* v. *D'Aulisa,* 133 Conn. 414, 418, 52 A.2d 636. Schools of learning, whether they be publicly or privately held, ordinarily provide an essential support of government, not only

by performing a state function, but also by preparing and training youth to render public service to the community and state. Originally, educational institutions were held tax exempt only if they performed both functions, i.e., were devoted to the public use and sequestered for educational uses. *Pomfret School* v. *Pomfret,* 105 Conn. 456, 460, 136 A. 88; *Brunswick School* v. *Greenwich,* 88 Conn. 241, 243, 90 A. 801. Later, on the premise that education in itself serves a public purpose, it was held sufficient for tax exemption purposes that the institution be devoted to educational uses, provided no person secure a profit from its operations. *Forman Schools, Inc.* v. *Litchfield,* 134 Conn. 1, 8–10, 54 A.2d 710, construing § 1163 (7) of the General Statutes (Rev. 1930), now § 12-81 (7) of the General Statutes. See also *Edgewood School, Inc.* v. *Greenwich,* 131 Conn. 179, 183, 38 A.2d 792. Where property held by an educational institution is not devoted to educational uses or other public purposes, however, it cannot be lawfully exempted from taxation. See *New Canaan Country School, Inc.* v. *New Canaan,* 138 Conn. 347, 352, 84 A.2d 691.

Thus, the statute involved in the present case, § 12-81 (8) of the General Statutes, must not be construed as abrogating the fundamental requirement that property held by an educational institution be devoted to educational uses in order to be tax exempt. Such a construction would make the exemption a matter of "grace or favor" which was condemned in *Corbin* v. *Baldwin,* supra, and would, in my judgment, violate the provision of our constitution which declares that "no man or set of men are entitled to exclusive public emoluments or privileges from the community." Conn. Const., art. first, § 1.

In the very case relied upon by the majority, it is clearly stated that the charter of Yale does not exempt from taxation property held for private use, nor does it authorize any commercial dealings with its exemptions. *Yale University* v. *New Haven,* supra, 338. Those restrictions must also be engrafted on the language used in § 12-81 (8), which is identical to that of the charter referred to in the *Yale University* case, supra.

In its finding, the trial court did conclude that the real property occupied by Yale University Press was used for educational purposes. The underlying facts, recited in the majority opinion, support that conclusion. It is only for that reason, however, that I concur with the result reached in this case. Yale "had its origin in a profound conviction on the part of the leaders of the infant Colony, that the public welfare demanded the establishment within its borders of a school of higher education, where young men might be prepared and trained to render the best public service to the community and State." *Corbin* v. *Baldwin,* 92 Conn. 99, 108, 101 A. 834. The publication of scholarly works by the Yale University Press serves not only to implement that goal, but also to further the public purpose of disseminating the knowledge of learned men.

For the foregoing reasons, I concur in the result.