[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This suit was brought by the plaintiff to collect moneys due from the defendants arising out of the alleged breach of a lease of pool tables. CT Page 13838
The lease contained a clause that the lease shall be interpreted in accordance with the laws of the State of Pennsylvania:
 "XXIV INTERPRETATION/JURISDICTION — THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN ENTERED INTO IN THE STATE OF PENNSYLVANIA AND SHALL BE INTERPRETED IN ACCORDANCE WITH THE LAWS OF THAT STATE. LESSEE HEREBY CONSENTS TO THE EXERCISE OF PERSONAL JURISDICTION OVER LESSEE BY ANY COURT IN ANY STATE OF PENNSYLVANIA IN ANY ACTION BASED ON BREACH OF THIS CONTRACT."
 Undoubtedly, parties to a contract may expressly select the choice of law by which it is to be governed. Pollack v. Danbury Mfg. Co., 103 Conn. 553, 557. (Citations omitted). `The [Uniform Commercial] Code's general choice of law provision leaves the determination of applicable law to common law principles.' (Citations omitted). Under General Statutes § 42a-1-105(1), `when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law of this state or of such other state or nation shall govern their rights and duties.' Fairfield Lease Corporation v. Pratt, 6 Conn. Cir. Ct. 537."
13 Pa. G.S.A. § 2A 101 et seq. contains the Division of the Uniform Commercial Code, "Leases." It is effective in one year from July 9, 1992. The effective date of the lease (Exhibit A) was December 14, 1993.
13 Pa. G.S.A. § 2A 103, "Definitions and index of definitions" contains a definition of "Finance lease," "Lease," "Lease Agreement," "Lease contract," and "Lease in ordinary course of business." The documents involved in the transfer of personal property fit the definition aforesaid.
The following is an excerpt from the Connecticut Appellate Court: CT Page 13839
 "A finance lease differs considerably from an ordinary lease, which typically involves only a lessor and a lessee, because it involves an additional party, the equipment supplier or manufacturer. Because the finance lessor is strictly a financing entity, the lessee ordinarily must look to that additional party for warrant, liability. `In effect, the finance lessee . . . is relying upon the manufacturer . . . to provide the promised goods and stand by its promises and warranties; the [lessee] does not look to the [lessor] for these. The [lessor] is only a finance lessor, and deals largely in paper, rather than goods. In that situation, it makes no sense to treat the [lessor] as a seller to the [lessee] with warranty liability, nor does it make any sense to free the manufacturer . . . from liability for breach of promises and warranties that it would have given in an outright sale to the [lessee]. Usually, the [lessor] expects to be paid, even though the [product] might prove to be defective or totally unsuitable for the [lessor's] particular business. Thus, a finance lease is a very different animal from an ordinary lease.' 1A J. White R. Summers, supra, p. 20.
 Evidence of the growing recognition of finance leases may be found in the case law as well as in the promulgation in 1987 of Uniform Commercial Code article 2A, governing leases of goods. Professor Hazard, in his foreword to this section of the code, noted the `exponential expansion of the number and scale of personal property lease transactions' and estimated as of 1987, that those transactions involved billions of dollars annually.
 The impetus behind the promulgation of article 2A was the impracticality of applying ordinary sales contract law to finance leases. Although article 2A has not been adopted in CT Page 13840 Connecticut, its provisions and commentary are instructive in the present case. See Texaco, Inc. v. Golart, supra, 461-62 (the standards set forth in the Uniform Commercial Code are a useful guide in examining claims of unconscionability). The essential characteristics of a finance lease were described by Professors White and Summers in their treatise on this article: `The parties can draft a lease agreement that carefully excludes warranty and promissory liability of the finance lessor to the lessee, and that sets out what is known in the trade as a "hell or high water clause," namely, a clause that requires the lessee to continue to make rent payments to the finance lessor even though the [equipment] is unsuitable, defective, or destroyed. How the lessee is to be assured that it will enjoy the benefit of the promises and warranties made by the manufacturer may be less obvious, but that too can be accomplished by agreement through a clause in the agreement between the manufacturer and the finance lessor to the effect that the warranties and other promises in that agreement will run to the benefit of the lessee. Thus the finance lessee becomes a third party beneficiary of the contract between the supplier and the finance lessor.' 1A J. White R. Summers, supra.
 Professors White and Summers later discuss the rationale behind the validity of such leases: `After all, the parties have actually entered into a financing transaction in which the lessor is really lending money and dealing largely in paper rather than goods. Put another way, the lessor as lender has no interest in how the lessee as debtor chooses to spend the money for goods. If the lessee should order an aircraft which is unsuitable or defective, this is not the lessor's problem. The lessor's responsibility is merely to provide the money, not to instruct the lessee like a wayward child concerning a suitable CT Page 13841 purchase. . . . Absent contrary agreement, even if [for example] our Boeing 747 explodes into small pieces in flight and is completely uninsured, lessee's obligation to pay continues.' Id., p. 25. "Emlee Equipment Leasing Corporation v. Waterbury Transmission. Inc., 31 Conn. App. 455, 465-468.
At trial, the plaintiff introduced as exhibits the following documents:
(1) An equipment lease, dated as being accepted by the plaintiff on December 14, 1993. Joseph E. Elliott as president, and Cheryl L. Elliott as vice-president, both signed for Joseph E. Elliott Candy and Tobacco Corp.
(2) Certificate of Acceptance and Satisfaction, dated December 30, 1993, signed by Joseph E. Elliott, as president of Joseph E. Elliott, Jr. Tobacco Co., Inc. a/k/a Joseph Elliott Tobacco Co., Inc. of Joseph E. Elliott, Jr. Tobacco Co., Inc. a/k/a Joseph Elliott Tobacco Co., Inc.
(3) Guaranty signed by Joseph E. Elliott and Cheryl L. Elliott, dated December 10, 1993.
(4) A letter telling the Joseph E. Elliott, Jr. Tobacco, Inc. that the rental was due on the 26th day of the month, acknowledged by Joseph E. Elliott, Jr.
(5) A Telephone Memorandum, acknowledging inter alia the receipt of 8 coin-operated pool tables.
(6) Telephone verification as to the lease of coin-operated pool tables to Joseph E. Elliott, Jr. Tobacco Co., Inc. for 65 months at $539.54 per month, dated January 11, 1994 and January 13, 1994.
(7) An Account Card, pertaining to the aforesaid lease.
(8) A cancelled check drawn by Cheryl L. Elliott, payable to Walnut Equipment Leasing Co. Inc. dated as of December 12, 1993, in the amount of $1527.00.
(9) A cancelled check on the account of Cheryl L. Elliott dated April 13, 1994 for $539.54. CT Page 13842
The defendant offered the testimony of Joseph Elliott and Cheryl L. Elliott, which essentially contradicted the testimony of the plaintiff.
The plaintiff offered, in rebuttal, the testimony of Seymour Nepiarsky, who had delivered the pool tables, and who signed the lease prior to the assignment to the plaintiff
"Q Self employed. And what do you do for a living?
A I sell vending equipment, coin operated devices.
Q And how long have you been so employed?
A About forty years.
 Q Okay. And are you familiar with the plaintiff corporation, Walnut Equipment Leasing Company, Inc.?
A Yes.
Q And how is it that you're familiar with Walnut?
A I funnel leases to them.
 Q And for how long have you been familiar with Walnut, or how long have you had a relationship with Walnut?
A I'd say, maybe, ten years, I really don't know.
 Q Okay. And are you familiar with the defendant corporation and the defendants, Mr. and Mrs. Elliot, in their individual capacities?
A Oh, yes.
 Q All right. And how is it that you're familiar with the defendant corporation and Mr. and Mrs. Elliot in their individual capacities, the defendants?
 A Well, I've known them for many, many years, even before the Joe Elliot Candy and Tobacco Company came into being. CT Page 13843
 Q Okay. And did you have an occasion to introduce the Elliot's to Walnut Equipment Leasing Company, at least the services provided by Walnut Equipment Leasing Company?
A Yes.
Q Okay. And when was that, if you can recall?
A Prior to the signing of the lease.
 Q Okay. And can you describe the reason why you made the introduction?
Why did you speak with the Elliot's about Walnut?
 A Mr. Elliot called me and told me he would like to buy coin operated pool tables for a facility he's opening up across the street from his place of business. And I went in and we discussed it, and that was it.
 Q Okay. And afterwards, did you have occasion to contact Walnut Equipment Leasing Company with regard to your conversations with Mr. Elliot?
 A Well, yes, because it was understood that it was not going to be a cash deal, but, it had to be leased or financed. And it ended up being leased through Walnut Leasing Company.
 Q Okay. And you explained that to Mr. Elliot and Mrs. Elliot?
 A Oh, there's absolutely no question about that, they — Certainly.
 Q All right. And in connection with the transaction that you've described, the leasing or the financing, did you present to Mr. Elliot any documents, or to Mr. or Mrs. Elliot, any documents from Walnut Equipment Leasing Company?
A Yes, because they had to be signed.
Q Okay. CT Page 13844
A It had to be an application.
 Q Okay. I'm going to ask you to take a look at Plaintiff's Exhibit A and could you identify that?
 A Certainly, I wrote it, I — I wrote the whole thing, I witnessed the signatures, and my signature was there.
Q Okay. Your signature is where on that document?
A To the left of Joseph and Cheryl Elliot's signatures.
 "Q This is the same thing. The signature that you're — that you're referring to, that's yours, is located where on that lease?
A To the left of Joseph and Cheryl Elliot's signatures.
 Q It says, though, does it not, next to your signature, by line, and underneath says title, does it not?
A Yes.
Q And above it, it says accepted by lessor?
A Right.
Q Were you the lessor?
A No.
 Q Okay. Why is it, then, that you signed that form in the place that you signed it?
 A I thought I was just acknowledging, in most cases, my signature is needed to acknowledge the signatures of the buyers.
 Q Okay. So, your signature is there, not as the lessor, but, instead, as a witness?
A No, I — I am not the — That is correct. CT Page 13845
Q Okay.
A That is correct.
 Q And do you know whether or not any other documents were signed by the Elliot's in connection with the transaction that you've described about the pool tables?
A Yes, Walnut asked for —"
 "Q I'm going to ask you to tell me — Actually, back up a little bit with regard to Plaintiff's Exhibit A, the lease, the signatures on the right hand side are of whom?
A Joseph and his wife, Cheryl.
 Q Okay. You indicated, in response to a question that I just posed, that you signed, as a witness, or — or you signed to acknowledge their signatures.
 Is — Is it fair to say, then, that those signatures were made in your presence?
A Yes.
 Q Okay. With regard to — Is there any doubt in your mind that it was the Elliot's that, in fact, signed that lease?
A None.
 Q Okay. With regard to Plaintiff's Exhibit C, the guarantee, I'm going to ask you to identify the signature on the lower right hand corner?
A That's mine.
 Q That's your signature. And, again, what was — what was the reason why you signed that document?
 A Well, that asks for the equipment supplier, which I was, in this case.
Q Okay. And it say, just above the bold bring, or, three CT Page 13846 words, not — can you read them?
A Yeah, signatures verified by.
 Q All right. Does that indicate to you anything? Does that indicate to you that you might be asked to witness or acknowledge the other signatures on the guarantee?
A Yes.
 Q Okay. And can you identify, please, the signature on the left and on the right, just above yours?
 A Joseph Elliot, and on the right was Cheryl Elliot's signatures — signature.
 Q Okay. And is it fair to say that you were acting in cap — in — in — you were acting as a witness to their signatures on that guarantee?
A Yes —
Q Okay.
A Yes.
 Q Did tho — Did Cheryl Elliot and Joseph Elliot, Jr. sign that document in your presence?
A Yes.
 Q Is there any doubt, in your mind, sir, that that document was signed in your presence?
A None, whatsoever."
 "It is the privilege of the trier to adopt whatever testimony he reasonably believes to be credible." Grote v. A.C. Hine Co., 148 Conn. 283, 287, 170 A.2d 138
(1961).
 "It is for the trier to pass upon the credibility of witnesses and the weight to be accorded the evidence. This court cannot retry the case." Edgewood Construction Co. v. West Haven Redevelopment Agency, 170 Conn. 271, CT Page 13847 272, 365 A.2d 819 (1976).
 "The trial court is the judge of the credibility of witnesses. That a fact was testified to does not make it an admitted or undisputed fact." Yale University v. New Haven, 169 Conn. 454, 463, 363 A.2d 1108 (1975).
 "The evidence presented must have been such as to furnish a more substantial basis for a conclusion than a mere guess, surmise, or conjecture." "The plaintiff was bound to remove the issues from the realm of speculation, and to establish facts affording a logical basis for the inferences which she claimed." Kruck v. Connecticut Co., 84 Conn. 401, 403.
The Elliotts sought to buy pool tables. The Elliotts agreed to enter a finance lease with Walnut Equipment Leasing Co. Inc. The Elliotts agreed to the terms. The lease went into default when the defendants failed to pay the agreed payments.
"The remedies provided by this title shall be liberally administered that the aggrieved party may be put in as good a position as if the other party had fully performed . . ."13 Pa. C.S.A. § 1106(a).
13 Pa. C.S.A. § 2A 103 has the following:
 "Lease agreement." The bargain, with respect to the lease, of the lessor and the lessee in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this division. Unless the context clearly indicates otherwise, the term includes a sublease agreement.
 "Lease contract." The total legal obligation that results from the lease agreement as affected by this division and any other applicable rules of law. Unless the context clearly indicates otherwise, the term includes a sublease contract.
The remedies of the lessor are set forth in 13 Pa. C.S.A CT Page 13848 § 2A 523 "Lessee's Remedies" as follows:
"(a) General Rule. If a lessee . . . fails to make a payment when due . . . the lessee is in default under the lease contract, and the lessor may:
(6) Exercise any rights or pursue any other remedies provided in the lease contract."
The following sums are due per paragraph III(A) of the lease agreement:
(a) Rent charges: $30,000.00
(b) Late charges: $ 1,505.01
(c) Collection Fees: $ 7,901.30
(d) Tax @ 6% $ 1,856.01
(e) Legal Fees: $ 6,196.88
TOTAL AMOUNT: $47,507.94
In addition to the answer, the defendants filed ten Special Defenses, and a three count counter-claim.
As to the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Special Defenses, the defendants failed to introduce any credible evidence to support the allegations. As to the Fifth Special Defense, Joseph and Cheryl Elliott failed to offer any credible evidence to support the allegation.
As to the First Count, said pleading fails to set forth any cause of action. As to the Second Count, said pleading is supported by no credible evidence. As to the Third Count, the defendant Elliott has failed to offer any credible evidence in support.
The plaintiff may recover from the defendants the sum of $47,507.94 and costs.
Burns, Judge Trial Referee CT Page 13849